J. J. LARKIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 102593.   Promulgated January 27, 1942.

*Hilary D. Mahin, Esq.,* and *L. Karlton Mosteller, Esq.,* for the petitioner.

*W. H. Payne, Esq.,* for the respondent.

#### OPINION.

MELLOTT: The instant proceeding, involving a deficiency in income tax for the year 1936 in the amount of $1,536.46, the major portion of which is in controversy, was submitted upon the following stipulation:

1. The Petitioner is an individual residing in Tulsa, Oklahoma. The taxable year involved is the calendar year 1936, for which year Petitioner filed his income tax return with the Collector of Internal Revenue, Oklahoma District. Petitioner is on the cash receipts and disbursements basis, and for 1936 filed his income tax return on such basis. Petitioner was a director of the Exchange National Bank of Tulsa, Oklahoma, from January 11, 1916, until April 23, 1933. On April 24, 1933, Petitioner was elected one of the directors of the National Bank of Tulsa, Oklahoma, which bank succeeded the Exchange National Bank of Tulsa, Oklahoma, and has been a director of the National Bank of Tulsa since that time.

2. At the close of business May 13, 1930, Joseph R. and Frances D. McGraw of Tulsa, Oklahoma, owed the Continental Illinois Bank and Trust Company, hereinafter referred to as the Continental Bank, a sum in excess of $320,000.00 upon a promissory note and had prior thereto pledged and deposited with the Continental Bank in excess of 4,000 shares of stock of the Exchange National Bank of Tulsa, Oklahoma, as collateral security to said promissory note.

At the close of business May 13, 1930, the Exchange National Company, a corporation doing business in Tulsa, Oklahoma, owed the Continental Bank the sum of $1,690,000.00, being the principal sums of the following promissory notes:

| | |
|---|---:|
| Note dated May 13, 1930, for | $725,000.00 |
| Note dated May 13, 1930, for | $500,000.00 |
| Note dated March 31, 1930, for | $340,000.00 |
| Note dated April 4, 1930, for | $125,000.00 |

The note dated May 13, 1930, in the principal sum of $725,000.00 included in its principal sum discounted interest at $5\frac{1}{4}\%$ per annum from the date of the note to its maturity. This discounted interest was $5,000.00. Included in the collateral security pledged to the Continental Bank with respect to all of the foregoing notes was 9,000 shares of stock of the Exchange National Bank of Tulsa, Oklahoma, the certificates for which were physically in the possession of the Exchange Trust Company, a trust receipt executed by the Exchange Trust Company with respect to these shares of stock being in the possession of the Continental Bank. The Exchange Trust Company was a wholly-owned affiliate of the Exchange National Bank of Tulsa, Oklahoma, and maintained its offices in Tulsa, Oklahoma. The Exchange National Company was a wholly-owned affiliate of the Exchange National Bank of Tulsa, Oklahoma, and maintained its offices in Tulsa, Oklahoma.

3. On May 14, 1930, the Petitioner, together with six other directors (H. F. Sinclair, E. W. Sinclair, J. A. Hull, J. H. Evans, J. H. Markham, Jr., and Harry H. Rogers) of the Exchange National Bank of Tulsa, Oklahoma, who are hereinafter referred to as associates, entered into a certain transaction for profit involving the acquisition of 12,000 shares of stock of the Exchange National Bank of Tulsa, Oklahoma, expecting at that time to thereafter resell, within about sixty days, the said block of 12,000 shares of stock. The stock of the Exchange National Bank of Tulsa, Oklahoma, acquired through this transaction consisted of 4,000 shares of said stock owned by Frances D. and Joseph R. McGraw, of Tulsa, Oklahoma, and then pledged and physically on deposit with the Continental Bank, as recited in Item 2 hereof, and 8,000 shares of the stock of the Exchange National Bank of Tulsa, Oklahoma, being a part of the 9,000 shares of said stock physically in possession of the Exchange Trust Company and represented by a trust receipt in the possession of the Continental Bank executed by the Exchange Trust Company and referred to in Item 2 hereof.

Petitioner and his associates agreed with Frances D. and Joseph R. McGraw and the Exchange National Company, the respective owners of the said 4,000 and 8,000 shares of stock, to acquire all their rights, titles, interests, and equities in said blocks of stock. Following this agreement Petitioner and his associates executed on May 14, 1930, a joint note in the principal sum of $1,040,000.00 payable to the Continental Bank. As collateral for this loan the Continental Bank retained 4,000 shares of stock of the Exchange National Bank of Tulsa, Oklahoma, previously owned by Frances D. and Joseph R. McGraw and then in its possession, and received 8,000 shares of stock of the Exchange National Bank of Tulsa, Oklahoma, delivered to it by the Exchange Trust Company, these 8,000 shares being a portion of the stock represented by the trust receipt issued by said Exchange Trust Company. Thereupon the amount of the loan to Petitioner and his associates totaling the principal sum of $1,040,000.00 was applied by the Continental Bank in reduction of indebtedness due it by Frances D. and Joseph R. McGraw by the principal amount of $320,000.00 and the balance of the said principal sum of $1,040,000.00 was applied in cancellation and in satis-

faction of the $725,000.00 note of the Exchange National Company dated May 13, 1930, due the Continental Bank, the amount then due on said note being $720,000.00 (principal of note $725,000.00 less $5,000.00 unearned discount).

During the years 1930 and 1931 the stock of the Exchange National Bank of Tulsa, Oklahoma, had a substantial value.

No consideration, other than as herein outlined, passed to the Petitioner, his associates, Frances D. and Joseph R. McGraw, the Exchange National Company, or the Continental Bank.

4. Following the conclusion of the meeting between the Petitioner and his associates on May 14, 1930, at which time the note for $1,040,000.00 was signed, the Petitioner on said date informed E. L. Connelly, his business associate, of the general nature of the transaction and offered Connelly one-half of the interest he had therein and to share equally with Connelly the profits and losses resulting therefrom. This offer of the Petitioner was accepted by Connelly. At the time the Petitioner informed Connelly regarding the general nature of this transaction he did not advise Connelly that he had joined in the execution of a joint note for the principal sum of $1,040,000.00 payable to the Continental Bank. Before the end of the calendar year 1930 the Petitioner did advise Connelly that he had signed, on May 14, 1930, the said joint note for $1,040,-000.00, and then advised him of all details of the entire transaction. Mr. Connelly did not, at any time, sign this note.

5. On September 21, 1931, Petitioner and associates arranged with the Continental Bank that the original joint note for the principal sum of $1,040,000.00 be cancelled and separate notes be executed by them or that payments be made thereon, as their several interests appeared. At that time, that is, September 21, 1931, the Petitioner executed his promissory note for the principal sum of $148,000.00 payable to the Continental Bank, this sum representing Petitioner's portion of the total liability to the Continental Bank, as between Petitioner and his associates, under the note of the principal sum of $1,040,000.00. Attached hereto and made a part hereof is a true and correct copy of this note for the principal sum of $148,000.00, marked Exhibit "A". [The note is payable 120 days after date with interest at 5 percent per annum payable monthly, recites that to secure its payment the maker has pledged, transferred and delivered 3,801 shares of Exchange National Bank stock to the bank, and authorized the bank to sell the collateral upon maturity and nonpayment and apply the net proceeds to the payment of the obligation.] Prior to the time the Petitioner executed the note for the principal sum of $148,000.00, he and E. L. Connelly discussed the situation then confronting them and agreed to continue their oral agreement as described in Paragraph 4 hereof. E. L. Connelly did not, at any time, sign this note.

6. On September 21, 1931, Petitioner and his associates executed guaranty agreements whereby all severally guaranteed to the Continental Bank the payment of the various individual notes executed by the several associates on September 21, 1931. Mr. Connelly did not, at any time, execute any of the guaranty agreements but was fully advised of them prior to their execution by the Petitioner. Prior to the hearing of this proceeding no payments have been required of or made by the Petitioner or E. L. Connelly with respect to said guaranty agreements.

7. On September 21, 1931, 1,659 shares of the 12,000 shares of stock of the Exchange National Bank of Tulsa, Oklahoma, previously pledged as collateral to the $1,040,000.00 joint note were issued in the name of the Petitioner and were retained by the Continental Bank as collateral to Petitioner's $148,000.00 note and his obligation under the guaranty agreements. These 1,659 shares

represented the portion of the 12,000 shares to which Petitioner was entitled under the agreement with his associates. On the same date Petitioner deposited with the Continental Bank 2,142 shares of stock of Exchange National Bank, individually owned by Petitioner, as additional collateral to the note and the guaranty agreements, making a total of 3,801 shares.

8. Petitioner renewed his $148,000.00 note from time to time as follows: January 19, 1932; May 19, 1932; August 17, 1932; September 16, 1932; October 17, 1932; January 16, 1933. The last renewal was for a period of 90 days and was in the sum of $148,000.00.

9. On April 24, 1934, the 3,801 shares deposited by Petitioner as collateral security for the $148,000.00 note and guaranty agreements, were sold by the Continental Bank for $1.67 and the proceeds thereof credited to Petitioner's note.

10. During the calendar year 1936, Petitioner paid $10,998.33 upon the principal amount of the obligation evidenced by the $148,000.00 note. During the year 1936 Petitioner was reimbursed by Mr. Connelly for one-half of such payment, or the sum of $5,500.00. This payment of $10,998.33 and the credit in 1934 of $1.67 reduced the principal balance of the said note to $137,000.00.

11. All of the acts performed and agreements made by Petitioner after the end of 1930, in connection with the transaction entered into for the acquisition of the shares of stock of the Exchange National Bank, were with the knowledge of E. L. Connelly and with the understanding between them that Petitioner was acting for both, pursuant to their oral agreement to share equally in the transaction and in the profits and losses resulting therefrom, and also in conformity with their understanding that Connelly would reimburse Petitioner for one-half of any loss or losses which Petitioner might incur with respect thereto.

12. The stock of the Exchange National Bank of Tulsa, Oklahoma, became worthless prior to January 1, 1935. Petitioner did not claim any loss or deduction in 1933 because of the worthlessness of the Exchange National Bank stock or in 1934 because of the sale of this stock by the Continental Bank.

13. In his amended income tax return for the year 1936, Petitioner claimed as a bad debt deduction the said sum of $5,500.00, referred to in paragraph 10 hereof, and Respondent disallowed the deduction so claimed on the ground that the evidence indicated that the stock of the Exchange National Bank of Tulsa, Oklahoma, became worthless in the year 1933.

The sole issue is whether petitioner sustained a deductible loss in the year 1936 in the amount of $5,499.17 when that amount was paid to the Continental Illinois National Bank, or whether he sustained a capital loss in an earlier year. While the deduction was claimed by petitioner in his return as a "bad debt" under section 23 (k) of the Revenue Act of 1936, it is obvious that the "debt" was one owed by, rather than to, petitioner. Manifestly he would have no right to deduct such a debt from his gross income.

The facts have been set out in full largely because the parties, upon brief, draw conflicting conclusions from them. Respondent contends that petitioner paid the amount "on a loan obtained from a bank in 1930, the proceeds of which were used and applied in the purchase from certain stockholders of shares of corporate stock, which shares were lost through sale by the pledgee bank and which also became.

worthless prior to the taxable year." He therefore seeks to apply the rule enunciated by this Board in *A. W. D. Weis*, 13 B. T. A. 1284. Petitioner contends that he purchased the property on credit; that, although the transaction took the form of a purchase of stock from the former owners, its real substance was an assumption by him and his associates of the indebtedness of the former owners without any change in the underlying collateral security; that "the Continental Bank and not petitioner was the party that had the real investment in the stock of the Exchange Bank and that incurred the risk of loss from the transaction"; and that under the rule of *Eckert* v. *Burnet*, 283 U. S. 140, he was not entitled to any deduction for a loss prior to actual payment of his indebtedness in the taxable year.

Respondent's interpretation of the stipulated facts is correct. Petitioner and his associates "agreed with * * * the respective owners * * * to acquire all their rights, titles, interests, and equities" in the stock. They executed a joint note payable to the Continental Bank and "thereupon the amount of the loan * * * was applied by the Continental Bank in reduction of indebtedness due it" by the McGraws and "in cancellation and in satisfaction of" the note of the Exchange National Bank. As collateral for the loan made to petitioner and his associates the Continental Bank retained the McGraw shares and received the shares of the Exchange National Bank. The substance of the transaction, as well as its form, was a loan by the bank to petitioner and his associates, the use of the proceeds in the purchase of stock, and the pledging of the stock as collateral to the loan. It is idle to contend that the bank "was the party that had the real investment in the stock." True, it had loaned a substantial sum and there was a possibility it might sustain a large loss; but it had no "investment" in the stock either before or after its transaction with petitioner and his associates, at least prior to the sale of the collateral in 1934. This conclusion is inescapable, especially when consideration is given to the events occurring on and after September 21, 1931, on which date 1,659 shares of the stock being acquired from the McGraws and the Exchange were issued in petitioner's name and accepted by the bank, together with 2,142 similar shares "individually owned" by him, as collateral security for his note and on which date his associates "severally guaranteed" his obligation.

In addition to *Eckert* v. *Burnet*, *supra*, petitioner relies upon the following cases: *Page* v. *Rhode Island Hospital Trust Co.*, 88 Fed. (2d) 192; *Jenkins* v. *Bitgood*, 101 Fed. (2d) 17; *Tams* v. *United States*, 33 Fed. Supp. 764; *Max Gross*, 36 B. T. A. 759; and an unpublished memorandum opinion of this Board. He also contends that recent decisions of the courts, especially *Helvering* v. *Price*,

309 U. S. 409, indicate "that the third party borrowing cases [*A. W. D. Weis, supra,* and other cases cited by respondent] are no longer entitled to the weight once accorded them."

In *Page* v. *Rhode Island Hospital Trust Co., supra,* a taxpayer, later deceased, had purchased and sold through a broker substantial amounts of stock, the account being grossly undermargined. Notes had been given to the broker for the indebtedness and some stocks yet remained in the account when the taxpayer died. After his death the remaining stocks were sold, the proceeds were applied upon the notes, and the executor of the decedent's estate paid the balance due. The court held that the giving of the notes in the earlier year had not constituted payment of the losses, quoted from *Burnet* v. *Huff,* 288 U. S. 156, to the effect that "the mere existence of liability is not enough to establish a deductible loss", and applied the rule of *Eckert* v. *Burnet, supra,* allowing the deduction in the year paid. It distinguished cases applying the rule that "sales of stock are ordinarily sufficient to identify losses as occurring in a certain year", pointing out that in the case of a grossly undermargined account the loss merely represents a debt due a broker from the customer and until there is a reimbursement to him there is no certainty the customer will ever pay or actually suffer a loss within the purview of the revenue act.

Both parties cite *Jenkins* v. *Bitgood, supra,* respondent pointing out that it inferentially approves the same rule as that applied by the Board in the *Weis* case and petitioner relying upon the fact that it applies the rationale of *Eckert* v. *Burnet, supra.* The issue involved the deduction of a loss claimed by a taxpayer who, in 1931, gave his note for $25,000 to a bank in which he owned stock, the amount being the cost to the bank of bonds then worth but $5,550. The court held that the substance of the transaction was a purchase of bonds at a price of $5,550, and a contribution of $19,450 to the capital of the bank; but since payment of the note was not made until a later year it denied the deduction of the loss which had been claimed in the year 1931. The court recognized the soundness of the principle of the *Weis* case, *supra,* citing also *Jarvis* v. *Heiner,* 39 Fed. (2d) 361; *Crain* v. *Commissioner,* 75 Fed. (2d) 962; and *Humphrey* v. *Commissioner,* 91 Fed. (2d) 155; but, adverting to the fact that the parties had not even gone through the form of a loan by the bank and a payment by the taxpayer, pointed out that "the giving of an unsecured note cannot be deemed an 'expenditure' that increased the taxpayer's investment, when the taxpayer is on the cash basis", and said: "It was rather the substitution of the taxpayer's note for the obligation already existing under the director's agreement, and falls within the principle of the *Eckert* case supra."

The court also held that the fact the note was secured by collateral did not justify treating it as equivalent to a cash payment—a view subsequently expressed by the Supreme Court in *Helvering* v. *Price*, *supra*. Cf. *Quinn* v. *Commissioner*, 111 Fed. (2d) 372.

In *Tams* v. *United States, supra*, the taxpayer had given his oral promise to repurchase from a group of stockholders their stock in a coal company, agreeing to pay par ($100) at the rate of $5 per year, the stockholders also to have the right to repurchase the stock at any time within five years. The stock became worthless shortly after the taxpayer had undertaken the purchase. The court sustained his contention that the amounts paid by him under this agreement were deductible in the years paid, saying:

The instant case is governed by *Eckert* v. *Burnet, supra, Jenkins* v. *Bilgood*, 101 F. (2d) 17 (39–1 USTC ¶9253), and the recent case of *Helvering* v. *Price*, (Mar. 25, 1940), 309 U. S. 409, which reaffirms both. See also *Page* v. *Rhode Island Hospital Trust Company*, 88 Fed. (2d) 192 (37–1 USTC ¶9138). The principle which these cases enunciate, is that a taxpayer on the cash basis who purchases property which later becomes worthless, payment for which is to be made in the future, can only deduct his loss when his debt is liquidated by cash or its equivalent, irrespective of when the property becomes worthless, this being true even though in an earlier year he gives his secured note to cover his indebtedness; or, in other words, the year when the deduction is allowable to a taxpayer on the cash basis is not necessarily the year in which the stock becomes worthless, nor the year when he recognizes the debt and gives his note or even his secured note, but it is the year, after, or within which, the property becomes worthless and within which he liquidates the debt by the payment of cash or its equivalent. The time of liquidation by cash or its equivalent is the criterion.

In *Max Gross, supra*, an associate of the taxpayer purchased bank stock, the taxpayer agreeing to share the losses. His portion of the loss was determined to be $11,925 and notes aggregating that amount were delivered to his associate. This Board held that, since the taxpayer was on a cash basis and did not part with any money or property during the taxable year, the claimed loss could not be allowed.

It will be noted that in none of the cited cases were the facts similar to those now before us. In *Page* v. *Rhode Island Hospital Trust Co.* there are more points of similarity than in any of the others; yet it is clearly distinguishable. The loss, as the court pointed out, "in the case of [a] 'grossly under-margined' account, merely represents a debt due a broker from the customer." In other words the borrowing and the purchase were integral parts of the same transaction. If the Continental Bank had purchased the stock for petitioner and his associates and held it as security the facts would be more nearly analogous. But petitioner and his associates were acquiring the stock, not through dealing with the bank, but

through dealing with "the respective owners" of it. The other cases are likewise distinguishable in that in all of them the transactions giving rise to the loss had involved only the payee and the maker of the note and in none of them had there been a borrowing from a third party.

*A. W. D. Weis, supra,* was one of the first cases decided by this Board involving the right of a taxpayer to deduct a loss paid with borrowed money. It was pointed out that there had been two separate and distinct transactions—a purchase of securities with an ultimate resultant loss through sale or worthlessness, and a borrowing of funds with a corresponding obligation to make repayment. The fact that the taxpayer repaid the loan in an earlier or a later year was deemed to be immaterial; for losses may be deducted only when "sustained during the taxable year" (sec. 23 (e), Revenue Act of 1936).

We are not convinced that the *Weis* case is unsound in principle or that it was overruled, as to a taxpayer upon the cash basis, by *Eckert* v. *Burnet, supra,* notwithstanding the statement to that effect—probably *obiter dictum*—in *Burns Manufacturing Co.* v. *Commissioner,* 59 Fed. (2d) 504; cf. *Frank Kuhn,* 34 B. T. A. 274, and *Max Gross, supra.* The *Eckert* case dealt with a taxpayer who, being secondarily liable upon an obligation, executed a note and thereby became primarily liable. It was held that he sustained no deductible loss until the note was paid. Petitioner, however, used his own credit and the stock which he was purchasing, borrowed the money from the bank, discharged his obligation to make payment to his vendors by securing satisfaction and cancellation of their indebtedness, and thereby became the owner of the stock. His loss upon this transaction occurred either when the stock became worthless or when it was sold in partial satisfaction of his indebtedness. He could not defer the taking of a deduction until such time as he chose to make payment of his obligation; for, as pointed out in the *Weis* case, "It is hardly reasonable to impute to Congress an intent to permit taxpayers to elect, for their own benefit, the years in which business losses should be deducted from income."

The decided cases, as the Circuit Court of Appeals for the Second Circuit pointed out in *Jenkins* v. *Bitgood, supra,* hold that where there are two transactions—a borrowing of funds and a purchase of stock—a taxpayer is permitted to deduct the loss in the year when the stock becomes worthless or the transaction is closed by sale, even though the borrowed money has not then been repaid. Compare *Jarvis* v. *Heiner, Crain* v. *Commissioner,* and *Humphrey* v. *Commissioner, supra,* all cited by the court. See also *T. Harvey Ferris,* 38 B. T. A. 312; affirmed per curiam, 102 Fed. (2d) 985. All of these

cases, except *Jarvis* v. *Heiner*, were decided since *Eckert* v. *Burnet*. It is also significant that the Ninth Circuit in *Humphrey* v. *Commissioner*, ignored its *obiter dictum* in the *Burns* case and stated:

Where a taxpayer is on the cash basis, the fact that he borrowed money with which to pay a loss does not postpone the right to deduct the loss until the payment of the loan, *Crain* v. *Com'r.* (C. C. A.) 75 Fed. (2d) 962, 963.

*Helvering* v. *Price, supra,* did not involve the question now before us. The taxpayer claimed he had satisfied his liability as a guarantor by giving his note, secured by collateral. The Court merely applied the doctrine of the *Eckert* case and held "the giving of the taxpayer's own note was not the equivalent of cash to entitle the taxpayer to the deduction."

The unpublished memorandum opinion of this Board, which petitioner contends is quite similar to the instant proceeding, has been examined but is distinguishable upon its facts. Three individuals were liable as guarantors in an amount aggregating $14,000. One of the guarantors paid his share of the obligation and also the share which should have been paid by the taxpayer and accepted the taxpayer's note for that amount. The taxpayer being on the cash basis and having made no outlay of cash or its equivalent in the taxable year, it was held on the authority of *Helvering* v. *Price, supra,* that he had not sustained a deductible loss.

In *Estate of Thomas Spruance*, 43 B. T. A. 221 (on appeal, C. C. A., 5th Cir.), one of the minor issues involved the deduction of a claimed loss on 46 shares of bank stock. The decedent had agreed to purchase these shares for $4,600. Thirty of them had been endorsed by the seller and delivered to the purchaser, the remainder being pledged to secure an indebtedness of the seller. Decedent agreed to take up the indebtedness for which the 16 shares were pledged, receiving a credit on the price in this amount, but this was never done. None of the agreed consideration was ever paid except an amount of approximately $800 credited on the purchase price through a trade of automobiles. We held that no loss was allowable for the $3,800 due on the purchase price since that amount had not been paid, citing *Helvering* v. *Price, supra.* That holding is not at variance with the *Weis* case nor with the conclusion reached in the instant proceeding. The situation would have been different as to the 16 shares if the taxpayer in that case had secured the cancellation and satisfaction of the obligation of his vendor, as petitioner and his associates did under the facts presently before us, even though this had been accomplished by the delivery of his note to the money lender.

Other cases cited by petitioner are not particularly relevant or helpful. *E. R. Hawke*, 35 B. T. A. 784 (reversed upon another issue,

109 Fed. (2d) 946; certiorari denied, 311 U. S. 657), and *Miniger* v. *Denman* (U. S. Dist. Ct., N. Dist. Ohio, July 2, 1930), both involved claimed losses upon stock, the purchase price of which had not been paid, though notes had been given. *Jacob F. Schoellkopf, Jr.*, 35 B. T. A. 855; affd., 100 Fed. (2d) 415, held, following the *Eckert* case, that a taxpayer who had assumed an indebtedness of a corporation then in liquidation had sustained no loss until the note which he executed was paid.

We are of the opinion and hold that the Commissioner correctly disallowed the claimed deduction.

Reviewed by the Board.

*Decision will be entered for the respondent.*

*Hilary D. Mahin, Esq.*, and *L. Karlton Mosteller, Esq.*, for the petitioner.

*W. H. Payne, Esq.*, for the respondent.