Charles D. Carter v. Commissioner.
Carter v. Commissioner
Docket Nos. 22177, 22520.
United States Tax Court
1950 Tax Ct. Memo LEXIS 120; 9 T.C.M. (CCH) 697; T.C.M. (RIA) 50202; August 16, 1950
H. K. Bell, Esq., 1216 Union Commerce Bldg., Cleveland, Ohio, for the petitioner. Thomas V. Lefevre, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent has determined deficiencies in income tax as follows: 1943, $149.78; 1944, $381.90; 1945, $1,980.12. The respondent now concedes that the petitioner is entitled to a deduction for the year 1944 in the amount of $180 for automobile depreciation. Effect will be given to this concession by the respondent with respect to the year 1944 under Rule 50. The sole issue is whether cash payments which the petitioner made in 1943, 1944, and 1945 constitute deductible losses under section 23 (e) (2) of the Internal Revenue Code *121 . The payments in question are as follows: $600 which was paid in 1943; $1,200, paid in 1944; and $2,200, paid in 1945. The petitioner alleges that the foregoing payments were installment payments which he made to purchase stock of a corporation. The parties are agreed that the stock became worthless in 1937. The respondent contends that the payments which were made in the taxable years were in partial discharge of loans received by the petitioner and that no deductions are allowable in the taxable years for amounts paid in repayment of loans; and that the year for the deduction of loss sustained from the purchase of stock was 1937, the year in which the stock became worthless. The petitioner filed his income tax returns for the taxable years with the collector for the tenth district of Ohio, at Toledo. The record consists of oral testimony, documentary evidence, and a stipulation of facts. From the entire record, we make the following: Findings of Fact The facts which have been stipulated are found as facts. The petitioner is a resident of Fremont, Ohio. During the taxable years he kept his books and he made his income tax returns on a cash basis. He was engaged in the advertising *122 business during the taxable years and during prior years, including the year 1930. He was associated in his business with a Mr. Christy. Petitioner and Christy conducted a business under the name of Carter, Christy Advertising Co. Petitioner deducted $360 for depreciation on two automobiles in his return for the year 1944. He is entitled to deduction for $180 for depreciation of one automobile; and he is not entitled to any deduction for depreciation of the other automobile. Petitioner overstated the loss deductions which he claimed in his returns for 1943 and 1945 in the respective amounts of $200 and $1,000. In August of 1929, petitioner purchased 20 shares of common stock and 20 shares of preferred stock of Western Reserve Air Motors Corporation for $1,000, or $50 for a unit of one share of common and one share of preferred stock. This transaction is not in issue in this proceeding. The common and preferred stock of Western Reserve Air Motors Corporation, hereinafter called "Western Reserve," became worthless in 1937 when the corporation became bankrupt and went out of business. In his income tax return for the year 1937, the petitioner took a loss deduction of $1,000 on *123 account of the worthlessness of this stock. In 1929, Western Reserve was engaged in the development of an air-cooled, wobble type construction, six-cylinder motor, which it intended to produce. It was engaged, also, in making a meter which could be used for metering gasoline. The president of the corporation, Kaase, came to Fremont, Ohio in 1929 where he had a conference with the petitioner, Christy, and Charles J. Miller about raising capital through the sale of stock of Western Reserve. Kaase had known Christy for about ten years before Miller ever met Kaase. Miller was president of The Fremont Foundry Company and the owner of about one-third of its stock. The Fremont Foundry Company made iron castings. Miller believed that Western Reserve might become a customer of The Fremont Foundry if it produced the air-cooled motor. Christy, Miller and petitioner told Kaase that they would purchase stock of Western Reserve. The petitioner has had a bank account with The Colonial Savings Bank of Fremont, Ohio since at least 1928. On August 30, 1929, and September 2, 1929, he drew checks on his checking account in the bank for the respective amounts of $800 and $200, payable to Western Reserve *124 Air Motors Corporation in payment for 20 shares of common and preferred stock which has been mentioned above. On October 15, 1929, petitioner made his check for $3,000 payable to Western Reserve, which was endorsed by that corporation. The Colonial Savings Bank made payment of the check on October 19, 1929. Charles J. Miller made a check dated October 19, 1929, for $3,000, payable to petitioner. The check was drawn against Miller's checking account with The First National Bank of Fremont, Ohio. Petitioner endorsed the check and deposited it in his checking account in Colonial Savings Bank, hereinafter called "Colonial bank," on October 18, 1929. Miller's check was postdated October 19th. It was actually paid on October 18th. Miller gave petitioner his check for $3,000 to cover petitioner's check of October 15th to Western Reserve. Petitioner was short of funds. The payment of $3,000 by petitioner to Western Reserve on or about October 15th was for 60 shares of common and 60 shares of preferred stock of Western Reserve. Two stock certificates, one for 60 shares of common stock and one for 60 shares of preferred stock, were issued by Western Reserve in the name of "Chas. D. Carter" *125 (the petitioner). The certificates were dated October 26, 1929. They were numbered C-100, and P-100. Petitioner made another check to Western Reserve in the amount of $3,000, dated November 9, 1929. This check was endorsed by Western Reserve. It was paid on November 14, 1929. Miller drew a check for $3,000, payable to petitioner, which was dated November 12, 1929. Petitioner endorsed this check and deposited it in his bank account in Colonial bank on November 12, 1929; and this check was paid on November 12, 1929. Miller's check was made to petitioner to cover his own check of November 9th to Western Reserve. Petitioner was short of funds. The payment to Western Reserve was for 60 shares of common and 60 shares of preferred stock. Western Reserve issued two certificates - C-102 and P-102, in the name of "Chas. D. Carter" for the aforesaid amount of stock. Both of these certificates were dated November 11, 1929. Petitioner made a check payable to Western Reserve in the amount of $3,000, dated December 10, 1929. Western Reserve endorsed this check and it was paid on December 12, 1929. On December 11, 1929, petitioner made a deposit of $1,500 in his checking account in Colonial bank; *126 and on December 12, 1929, he made another deposit of $1,500. The two deposits, totalling $3,000, were deposits of two checks of Miller made payable to petitioner, and were to cover petitioner's check to Western Reserve for $3,000, dated December 10, 1929. Petitioner was short of funds. The payment of $3,000 to Western Reserve was for 60 shares of common and 60 shares of preferred stock of Western Reserve. Western Reserve issued two certificates - C-105 and P-105, for the aforesaid stock in the name of "Charles D. Carter." Each certificate was dated December 10, 1929. Petitioner endorsed in blank the six certificates of Western Reserve for common and preferred stock; i.e., certificates numbered C-100, C-102, C-105, P-100, P-102, and P-105. Petitioner signed his name in ink on the back of each certificate in the space for signature under the printed form of assignment as follows: "Charles D. Carter." Petitioner's signature on certificates C-100, P-100, C-102, and P-102 were witnessed by V. M. Engler who signed her name beneath the date "December 11, 1929" which was written in ink, apparently by petitioner. Engler signed the certificates. Engler was a secretary in Miller's office. The *127 endorsements by petitioner of certificates C-105 and P-105 were under the date "December 12, 1929," written in ink on the back of each certificate. These endorsements were not witnessed in so far as the certificates themselves show. Petitioner delivered the six stock certificates, endorsed in blank as above set forth to Miller on December 11, 1929 and December 12, 1929. Christy and Miller bought stock of Western Reserve, and certificates of stock were issued to each of them in their names, respectively. Miller purchased at least 270 units of stock of Western Reserve. During 1929, Western Reserve issued stock in petitioner's name having a total par value of $10,000, including the stock of $1,000 par value for which petitioner made payment by his checks dated August 30, 1929, and September 2, 1929. Petitioner and Miller discussed, in 1929, the matter of petitioner's ability to purchase Western Reserve stock. With respect to checks of petitioner to Western Reserve dated October 15, 1929, November 9, 1929, and December 10, 1929, each in the amount of $3,000, it was understood by petitioner and Miller that Miller would provide funds of $3,000, in each instance, which petitioner *128 would deposit in his checking account in Colonial bank to cover each of petitioner's checks for $3,000. As of the end of 1929, $9,000 had passed from Miller to petitioner's bank account in Colonial bank. It was agreed between petitioner and Miller that Miller was to get back the total sum of $9,000, and that Miller was to hold the six certificates of Western Reserve for 180 shares of common and 180 shares of preferred stock, which petitioner had endorsed in blank and had delivered to Miller, until Miller received the entire sum of $9,000. There was no agreement between Miller and petitioner that Miller would deliver back to petitioner any one of the three pairs of certificates of stock when, as, and if petitioner paid Miller a sum equal to the par value of any pair of certificates. Each pair of certificates for 60 shares of common and 60 shares of preferred had a par value of $3,000, based on a par value of $50 for one share of common and one share of preferred. Petitioner did not make any payments to Miller during 1929 in connection with any of the three transactions in the stock in question. In the spring of 1930, Western Reserve needed additional capital. The sum of $5,000 was *129 borrowed from Colonial bank in 1930 by petitioner under a 6 per cent interest note signed by petitioner and Miller. Petitioner and Miller were severally liable under the note, but it was agreed between petitioner and Miller that petitioner was to pay the note, plus the 6 per cent interest, i.e., repay the Colonial bank loan. Petitioner paid the note gradually, and the interest. As of August 17, 1939, after renewals of the note, the balance owing Colonial bank was $4,485. The note was renewed until it was finally paid by petitioner in July of 1945. All of the renewal notes were signed by petitioner and Miller. For convenience this loan is sometimes referred to hereinafter as "the Colonial bank loan of 1930." The aforesaid $5,000 which was borrowed from Colonial bank was turned over to Western Reserve. Western Reserve issued a pair of certificates in the name of "Chas. D. Carter," dated April 7, 1930, certificate numbers C-115 and P-115, for 50 shares common and 50 shares preferred stock, having a total par value of $2,500. At about the same time, Western Reserve issued common and preferred stock to Miller having a total par value of $2,500. Miller credited petitioner with the amount *130 of $2,500 leaving a balance owing Miller in the "account" of petitioner with Miller of $6,500 as of the date of about April 7, 1930. Western Reserve's venture did not progress well. In July of 1930, stockholders were dissatisfied, and Miller believed that the affairs of the corporation had been mismanaged. At some time, a promise had been made to elect Miller and petitioner to the board of directors, but they had not been elected to the board. At a stockholders' meeting which was held in July of 1930, Miller was elected to the board, but petitioner was not elected to the board. Miller declined to serve unless petitioner and Christy were elected to the board also. Miller endeavored to have a receiver of Western Reserve appointed. At some time before a hearing on the petition for appointment of a receiver, an outside party advanced funds for the payment of Western Reserve's debts. Western Reserve then abandoned the plan to produce air-cooled motors, and took up manufacturing water meters. Miller's efforts to have a receiver appointed were unsuccessful. Western Reserve went into bankruptcy, finally, in 1937. On November 6, 1930, Miller sold 270 shares of Western Reserve stock, $50 *131 par value per share, to Hornblower and Weeks, securities brokers, for one dollar per share, or $270. Although petitioner made periodic payments on the Colonial bank loan of 1930 until he repaid the entire principal amount of $5,000, the last payment being made in July of 1945, petitioner did not make any payments to Miller during this period. After the 1930 loan was repaid to Colonial bank, petitioner borrowed another five thousand dollars for which a note was given to the bank on August 8, 1945. The note was signed by petitioner and by Miller. Each maker of the note was severally liable. The note bore 5 per cent interest. It was agreed between petitioner and Miller that petitioner would repay this loan to Colonial bank, both principal and interest. The entire amount, $5,000, was paid to Miller in August of 1945, in complete satisfaction of the balance of $6,500, of petitioner's "account" with Miller, Miller agreeing to waive $1,500. Petitioner has made periodic payments on the second loan of Colonial bank. The note has been renewed from time to time. Miller has signed the renewal notes with petitioner. As of the time of the trial of this proceeding, the unpaid balance of the note *132 owing to Colonial bank was about $1,350. When Miller received $5,000 from petitioner on or about August 8, 1945, he surrendered to petitioner all of the Western Reserve stock issued in petitioner's name which he held under endorsements in blank, namely, the three pairs of certificates dated October 26, 1929, November 11, 1929, and December 10, 1929. If he held, also, the pair of certificates dated April 7, 1930, he surrendered those certificates to petitioner, also, but Miller is not certain as to whether he ever held the certificates dated April 7, 1930. Petitioner paid Colonial bank $600 during 1943 on the loan of 1930. Petitioner paid Colonial bank $1,200 during 1944 on the loan of 1930. Petitioner paid $2,200 to Colonial bank during 1945 of which $1,700 was applied to the balance of the 1930 loan, and $500 was paid on the 1945 loan. Petitioner paid the interest during 1943, 1944, and 1945 on the notes given to Colonial bank for which he took deductions for interest paid in his returns for the taxable years. Petitioner paid the interest on the Colonial bank loan of 1930 during the time it was owing. The petitioner borrowed $3,000 from Miller on October 18, 1929. He used the *133 proceeds to purchase 60 units of common and preferred stock of Western Reserve from Western Reserve. He pledged the stock to Miller on December 11, 1929, as security for repayment of the loan. The petitioner borrowed $3,000 from Miller on November 12, 1929. He used the proceeds to purchase 60 units of Western Reserve stock from Western Reserve. He pledged the stock on December 11, 1929, to Miller as security for repayment of the loan. The petitioner borrowed $1,500 from Miller on December 11, 1929, and $1,500 from Miller on December 12, 1929. He used the proceeds - $3,000 - to purchase 60 units of Western Reserve stock from Western Reserve. He pledged the stock to Miller as security for repayment of the loan on December 12, 1929. Petitioner borrowed from Colonial bank $2,500 in 1930, and $5,000 on August 8, 1945. He paid $2,500 to Miller in 1930 in partial repayment of Miller's loans totalling $9,000; and he paid $5,000 to Miller in August of 1945 in full settlement of the balance of the amount owing to Miller. The petitioner borrowed $2,500 from Colonial bank in 1930, and used the proceeds to purchase 50 units of stock from Western Reserve. Petitioner repaid Colonial bank *134 the principal amount of the loan of 1930, plus interest. The petitioner has made payments of the bank loan of August 8, 1945, plus interest, from time to time, or which an unpaid balance is still due and unpaid. Opinion The issue in this proceeding arises out of transactions in 230 shares of common and preferred stock of Western Reserve Air Motors Corporation, 180 of which were issued by Western Reserve in 1929, and 50 units of which were issued in 1930. The stock of that corporation became worthless in 1937, but the petitioner did not claim any loss deduction in 1937 with respect to the shares of stock which are in question in this proceeding. The petitioner reports his income for the income tax on a cash basis. He now claims deductions in the taxable years 1943, 1944, and 1945 for the amounts which he paid in each of the taxable years on notes he gave to the Colonial bank. The notes were given for loans of the Colonial bank, and the loans were obtained by petitioner for the purpose of repaying Miller and for the purpose of purchasing an additional 50 units of stock in 1930, as has been set forth in the findings of fact. The parties have stipulated a few facts, but the stipulation *135 represents only the agreement of the parties upon neutral facts which do not move the balance one way or the other - for the petitioner, or for the respondent. For the most part, the record in this proceeding consists of oral testimony and several exhibits. The parties are in sharp disagreement with respect to the facts which are to be found from all of the evidence. In this situation, this Court as the trier of the facts, must make a careful and painstaking analysis of the record and find the principal facts from the entire record as fairly as can be done from the evidence which is before it. This has been done. The ultimate facts which have been found as facts are not the facts which the petitioner has urged the Court to find. There is no question of law to be decided. The parties, through their counsel, acknowledge the rules of law which are applicable under the issue presented. If certain facts existed, the issue is controlled by one rule of law as enunciated by well established authorities. But if other facts existed, other authorities are controlling. The respective authorities relied upon by each party will be set forth hereinafter. Our first consideration must be of the evidence *136 before us, and its is necessary to discuss the evidence in view of the differences in views of the parties with respect to the facts which properly can be found from the entire record. The petitioner contends that he bought four lots of stock of Western Reserve from Miller, there in 1929 and one in 1930. The lots of stock have been identified in the findings of fact by the numbers of the stock certificates. There is no disagreement between the parties as to the shares of stock which are involved. The petitioner rests his case upon the contention that Miller bought the four lots of stock in question and agreed to sell them to the petitioner under an arrangement which, it is alleged, was in substance an installment purchase contract. The alleged contract was not written but was an alleged oral agreement. Both Miller and petitioner gave testimony in this proceeding. Petitioner relies largely upon the testimony. The record contains several exhibits. The facts which must be found from them have to be weighed along with the oral testimony. When those facts are considered, they are found to be in conflict with some of the testimony. Also, there is conflicting testimony. Miller's statements *137 do not corroborate some of petitioner's testimony. Some matters could not be recalled with exactitude by Miller. Western Reserve's president, named Kaase, undertook to obtain capital for Western Reserve at some time in 1929 through the sale of units of one share of common and one share of preferred stock of Western Reserve having a par value of $50 per unit, and the units of stock were offered for sale at par. Both Miller and petitioner have testified that during conferences of Kaase with Christy, Miller and petitioner at some time in 1929, the amount of the desired capital which was discussed was from thirty to thirty-five thousand dollars. Miller has testified that he, Christy and petitioner agreed with Kaase to purchase $30,000 of the units of stock - $10,000 of units of stock to be purchased by Christy, $10,000 by Miller, and $10,000 by petitioner. [1] On the other hand, although the petitioner agrees that an agreement was made in 1929 with Kaase, [2] he has denied in his testimony that there was an agreement that each of the above named persons would purchase ten thousand dollars worth of stock. *138 Certain evidence corroborates Miller's testimony. There are in evidence checks of petitioner which total $10,000, all of which were made payable to Western Reserve, and the petitioner admits that beginning on August 30, 1929, he made checks to Western Reserve during 1929 which aggregate $10,000. There was no syndicate formed to purchase a block of stock. The evidence is clear on the point that Christy bought stock from Western Reserve, and that Miller did the same. The dispute in this proceeding is over the point of how much stock Miller bought, and whether petitioner bought stock from Miller. It must be noted that Western Reserve did not issue 200 share lots (par value $10,000) of stock at one time to each of the three persons who agreed to purchase stock, as Miller has testified was done. There is no evidence relating to Christy's purchases. There is very little evidence relating to Miller's purchases; i.e., the certificates of stock which were issued to him are not in evidence. The certificates of stock which were issued in petitioner's name are in evidence, excepting those for which he made checks for $800 and $200 on August 30 and September 2 of 1929. The certificates which *139 are in evidence are dated October 26, 1929, November 11, 1929, December 10, 1929, and April 7, 1930 (for an additional 50 shares of a par value of $2,500). The checks given in payment for each issuance of stock are in evidence. The checks (5 groups), and the certificates (4 groups) are evidence of five separate issuances of stock. (The certificates for the first lot of stock which were issued are not in evidence.) The tenor of Miller's testimony is that Western Reserve issued stock to himself in the same quantities that it issued stock to petitioner. It is assumed, therefore, that five lots of stock were issued to Miller in his name, just as five lots of stock were issued to petitioner in his name. Miller sold 270 units of stock in 1930. This fact supports the inference that about the same amount of stock was issued to Miller as was issued to petitioner. The evidence shows, at least, that 270 units were issued to Miller, and 250 units were issued to petitioner in their individual names. It is clear that all of the stock which was issued to petitioner was issued directly to him by Western Reserve upon receipt of his checks made payable to Western Reserve, and that none of the stock *140 in question was issued first to Miller and then transferred out of his name to petitioner's name. This fact is an important one in considering the contention of the petitioner that he bought stock from Miller. Petitioner does not deny that he gave his own checks to Western Reserve and that Western Reserve issued and delivered to him, in exchange for his checks, the first three units of stock which were issued in 1929. Petitioner does not contend that the 50 units issued in 1930 were issued first to Miller and then re-issued to him, and the record shows that the 50 units were issued directly to petitioner in 1930. The ordinary view of a transaction where a person makes a payment to a corporation, and the corporation thereupon issues stock to that person is that the corporation has sold stock to the person, and the person has purchased stock from the corporation. In this proceeding there were four of such transactions between the petitioner and Western Reserve. The petitioner advances the argument, despite these facts, that he bought stock from Miller, on four different occasions, and that he bought stock from Miller under an installment payment arrangement. Petitioner asserts that *141 there was such an arrangement because (1) in 1929, Miller advanced money to him on three occasions at about the same time when petitioner made his own checks to Western Reserve; and (2) Miller believed Kaase would think Miller was attempting to get control of Western Reserve if Miller's purchases of stock from the corporation were extensive. The second reason given by petitioner as partial explanation for his contention is not convincing. It is not supported, for example, by any evidence showing the total outstanding stock of Western Reserve. Since the burden of proof is upon petitioner, he must present more than what can best be described as conjecture, or theory, in support of his contention. We cannot give this contention much weight. It is an untenable one. The first explanation must be considered. Miller advanced $3,000 to petitioner on October 18, 1929 (the check was mis-dated October 19th); $3,000 on November 12, 1929; $1,500 on December 11, 1929; and $1,500 on December 12, 1929. These advances were to cover petitioner's checks to Western Reserve. Miller did not advance any funds to petitioner in 1930, however. Petitioner borrowed $5,000 from the Colonial bank in April *142 of 1930, of which $2,500 was paid to Western Reserve for the 50 units of stock issued to petitioner on April 7, 1930. A distinction must be made between the transactions in Western Reserve stock in 1929 and in 1930. Only one conclusion can be made about the transaction of April 7, 1930, and that is that the petitioner borrowed $5,000 from Colonial bank at some time prior to April 7th; that he purchased 50 units of stock, represented by the certificates dated April 7th, from Western Reserve; and that he paid the remaining $2,500 to Miller out of the bank loan. Miller used the $2,500 to purchase 50 units of stock for himself. Petitioner does not deny that fact. It is held that the 50 units of stock issued to petitioner by Western Reserve on April 7, 1930, were purchased by petitioner directly from Western Reserve with $2,500, cash, which the petitioner borrowed from the Colonial bank, and the facts have been found accordingly. With respect to the stock issued on April 7, 1930, the contention of the petitioner that he bought this stock from Miller under an installment arrangement is rejected as being wholly untenable and unsupported by the evidence. With respect to the three transactions *143 in Western Reserve stock in 1929, it is concluded that the petitioner borrowed $3,000 from Miller in each instance for the purpose of purchasing 60 units of stock in each transaction from Western Reserve. There is no evidence to support the contention that the three lots of stock were in fact purchased by Miller and sold by him to petitioner under an installment sales arrangement excepting petitioner's own testimony that such understanding existed. Petitioner's testimony involves only his interpretation of what was done and is self-serving. He has not presented evidence of actual facts from which a conclusion can be drawn that he was purchasing stock from Miller on an installment basis. For example: There was no agreement that installment payments would be made in any specific amount or during any stated period. There were three purchases of three lots of stock, but there was no agreement that when petitioner paid Miller the cost of one lot, $3,000, that one lot of stock would be released to petitioner. But such arrangement would be the normal one if stock were being purchased on an installment basis. In 1930 petitioner paid Miller $2,500, which petitioner borrowed, and which was only *144 $500 short of the cost of one lot of stock. If there had been a bona fide installment purchase arrangement, it would have been consistent therewith for petitioner to have arranged for a slightly larger loan from the bank to cover payment for one lot of stock. Miller's testimony is in conflict with petitioner's testimony on this point. Miller testified as follows: "* * * And Mr. Carter thought he could borrow money at that time, but he wasn't able to. "And I says, 'Well, I will give you the money and so as you can pay for the stock, so as they won't know I am buying it direct for you. And then I will take the stock and hold it as collateral and when you pay me I will surrender the stock to you'" [3]
Miller has testified at length in this proceeding. He has testified that he advanced money to petitioner in 1929 on each occasion when petitioner gave his own check to Western Reserve for stock; that petitioner deposited the money advanced by Miller in his own bank account and drew his own check against his own account payable to Western. The documentary evidence in this proceeding establishes those facts. Miller admits that petitioner did not endorse the *145 three sets of stock certificates and deliver them to him until December 11, 1929, and December 12, 1929, and that the three sets were endorsed and delivered to him at about the same time, which was after all three sets of certificates had been issued to petitioner by Western Reserve. Miller's testimony is not entirely consistent at all times, and he admitted his inability to remember some details after twenty years. His entire testimony shows only that the understanding he and petitioner had in 1929 was a loose and informal one under which Miller agreed to advance money to petitioner with which petitioner was to purchase the three lots of stock; petitioner was to repay the money when he was able to do so; Miller believed in petitioner's honesty but he wanted the stock certificates endorsed in blank and delivered to him as "collateral" to secure repayment of the money advanced; and Miller intended holding all of the stock until petitioner repaid all of the $9,000 advanced. Nothing was said as to when petitioner would repay the sums Miller had advanced. Petitioner made no repayments to Miller after the payment of $2,500 in 1930, during a period of over fourteen years. In 1945, Miller *146 urged petitioner to get a bank loan so that the obligation could be settled, which was done, and Miller accepted $5,000 in August of 1945 in full settlement of the balance owing to him of $6,500. Miller's testimony on the point of who owned the 180 units of stock during all of the period is confused and contradictory. He has testified both ways on this point - that he owned the stock, and that petitioner owned the stock, [4] but his entire testimony indicates that he regarded the stock as security for repayment of his advances of money to petitioner. The only reasonable conclusion to be made is that Miller made loans of money to petitioner on three occasions in 1929; that petitioner used the borrowed funds to purchase stock from Western Reserve, and that subsequently he endorsed the three lots of stock in blank and delivered them to Miller as security for repayment of the loans. The facts have been found to that effect from the entire record. It should be made clear, also, that on the two occasions when the petitioner borrowed $5,000 from the Colonial bank in 1930 and in 1945, he was the borrower and Miller joined with him as a maker of the notes to *147 the bank as a guarantor. Miller's testimony is clear on this point. Miller has testified that in 1930, he told petitioner to borrow $5,000 from the bank; that he (Miller) would endorse a note; and that he (Miller) would take one-half of the sum borrowed in partial payment of the $9,000 petitioner owed him. With respect to the second bank loan, Miller has testified that he told petitioner in about July of 1945 that he needed money, that petitioner borrowed $5,000 from the bank, and that he (Miller) endorsed the note so that petitioner could obtain the loan. A further observation is made about the oral testimony in this proceeding. From all of the evidence - testimony and documentary - it is apparent that the petitioner did not, at any time, endeavor to make any "installment" payments to Miller, as he would have attempted to do if there had been any bona fide agreement to purchase stock from Miller on any installment basis. Instead, petitioner resorted to bank loans when pressed by Miller to make repayment to Miller, and in the end, Miller was repaid $7,500 and waived the balance of $1,500. In arriving at the foregoing conclusions and in making findings of fact from all of the evidence *148 which differ from the findings of fact which the petitioner contends should be made, it has become evident that in 1929 Miller and petitioner acted informally. Now, the petitioner contends that the loose arrangements which were made were "in substance" a purchase of stock by Miller and an agreement on his part to sell the stock to petitioner on an installment basis. Consideration has been given to petitioner's testimony and to his contentions. Suffice it to say that we cannot accept petitioner's interpretation as correct; it is not, in our opinion, borne out by the entire record in this proceeding. Having found that all of the transactions of the petitioner - three in 1929 and one in 1930, were with Western Reserve, and that the petitioner purchased three lots of stock in 1929 with money borrowed from Miller, and one lot of stock in 1930 with money borrowed from Colonial bank, the issue is controlled by J. J. Larkin, 46 B.T.A. 213; dismissed, 129 Fed. (2d) 1020. See, also, Samuel Eugene Bramer, 6 T.C. 1027; aff'd per curiam, 161 Fed. (2d) 185; certiorari denied, 332 U.S. 771; and A.W.D. Weis, 13 B.T.A. 1284. *149 In this proceeding, as in Larkin's case, it is concluded that the substance and the form of the three transactions in 1929 were three purchases of stock by the petitioner from Western Reserve, and three loans of funds by Miller (a third party) to the petitioner, the proceeds of which loans were used for the purchases of stock. It cannot be found that Miller had "investments" in the stock when consideration is given to the fact that the stock was issued to petitioner, and he was the stockholder and the record owner of the stock at all times. Miller has testified that he held the 180 units of stock as "collateral." The contention which is now made that Miller did not loan funds to petitioner but, rather, was the owner of the stock which had been pledged with him to secure the loans appears to be a belated interpretation of the arrangements which were made and carried out. See J. J. Larkin, supra, pp. 217, 220. Petitioner's loss occured when the stock became worthless, which was in 1937. He cannot now take deductions for payments on the loans in the later years in which he made repayments of loans in partial satisfaction of those separate obligations, and thereby defer *150 to other years the taking of deductions on account of loss sustained from worthless stock. It should be kept in mind, also, that the deductions now claimed are for payments which the petitioner made in the taxable years on two loans to him by Colonial bank. The proceeds of the bank loans were used to repay Miller's loans and, also, to buy additional stock in 1930, all of which constitutes a complexity of loans upon loans; and the complex becomes even more comlicated because there is not (even if it were possible) any allocation of the amounts of the deductions claimed in the taxable years to the partial repayment of loans used to purchase the 1929 stock, and to the partial repayment of the bank loan to purchase the 1930 stock. "It is obviously impossible to earmark the capital employed in every transaction which results in loss." A.W.D. Weis, supra, p. 1288. It is well to point out, also, that it is extremely difficult to comprehend the contention that Miller was the owner at any time of the 50 units of stock which the petitioner purchased in 1930, or, even, that those certificates were ever pledged to Miller. Since the stock was purchased by the petitioner with the *151 proceeds of half of the 1930 loan by the Colonial bank - $2,500 - there was no reason to pledge that stock to Miller. Miller was unable to state categorically that the certificates for the 50 units of stock which were issued to petitioner in 1930 had ever been pledged to him. Petitioner relies upon E. L. Connelly, 46 B.T.A. 222; Eckert v. Commissioner, 283 U.S. 140; Helvering v. Price, 309 U.S. 409. The facts in this proceeding distinguish it from all of the foregoing authorities and bring the issue, instead, within the rule of Larkin's case which distinguished the above cited cases. We refer the parties to the extensive review of authorities in Larkin's case and to the distinctions noted therein, rather than repeat the discussion here, all of which applies to and controls the question in this proceeding. It is held that the sums which the petitioner paid in 1943, 1944, and 1945 on his notes to the Colonial bank do not constitute deductible losses within the intendment of section 23 (e) (2) of the Internal Revenue Code, since they were in partial discharge of petitioner's obligation to repay bank loans which were separate *152 from his transactions in 1929 and 1930 with Western Reserve for the purchase of stock. The losses from the transactions in stock were sustained in 1937, and deductions therefor could not be deferred until the taxable years. The respondent's determinations are sustained. Decision will be entered under Rule 50 in Docket No. 22177. Decision will be entered for the respondent in Docket No. 22520. Footnotes
1. Transcript, pp. 42 and 44. ↩
2. Transcript, p. 72, testimony of petitioner: "Kaase came down there and the agreement was signed."↩
3. Transcript, p. 42.↩
4. Transcript, pp. 46, 48.↩