HOWARD M. BRENNER AND PEGGY BRENNER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3004–72.    Filed September 30, 1974.

*Edward G. Hearn,* for the petitioners.
*Barry D. Gordon,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in the amount of $42,749.30 in petitioners' Federal income tax for 1968. The issue to be decided is whether petitioner Howard Brenner's repayments of loans, after being discharged from all debts in a bankruptcy proceeding, constitute ordinary and necessary expenses, deductible under section 162(a)[1] and includable in a net operating loss carryover under section 172.

### FINDINGS OF FACT

At the time their petition was filed with this Court, petitioners Howard M. Brenner (hereinafter petitioner or Brenner) and Peggy Brenner were legal residents of New York, N.Y. They filed joint income tax returns for 1960 through 1968 on a calendar year basis, employing the cash receipts and disbursements method of accounting.

In November 1956, Brenner was employed as an account executive with Ira Haupt & Co. (Ira Haupt), a New York brokerage firm. He remained in this position until July 1963 when he was offered a 1-percent partnership interest in the firm at a price of $200,000. To raise the capital necessary for the purchase of the partnership interest in Ira Haupt, Brenner borrowed the following sums:

(a) On September 27, 1963, Brenner borrowed $60,000 from Stephanie Green Peterson, consisting of $23,000 in cash and $37,000 in stock. The loan was evidenced by a promissory note payable January 1, 1973, which did not provide for any interest, and by a written agreement signed by Brenner, which was filed with the New York Stock Exchange as required under its rules. Notwithstanding the fact that Brenner alone signed the note, Peggy Brenner was a surety with respect to the loan. Stephanie Green Peterson is petitioner Peggy Brenner's aunt.

(b) On September 30, 1963, Brenner borrowed $25,000 from the Irving Trust Co. and signed a promissory note payable 1 year thereafter with 5½-percent interest. By September 30, 1964, petitioner had repaid $8,700 of this loan, and on that date he executed a new note of $16,300 for the unpaid balance.

(c) Brenner's petition in bankruptcy, referred to below, reflects that Peggy Brenner, his wife, is a general creditor, having made loans to him on September 30, 1963, and October 3, 1963, in the amounts of $16,893.95 and $1,127.53, respectively, to enable him to purchase his interest in Ira Haupt.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

(d) On October 1, 1963, Brenner borrowed $55,000 from Joseph T. Fish, consisting of $25,000 in cash and $30,000 in municipal bonds. The loan was payable January 2, 1969, with interest at 6 percent per annum upon the unpaid principal amount of cash and at 4 percent per annum upon the principal amount of the bonds. Peggy Brenner was a guarantor of the loan.

(e) On October 10, 1963, Brenner borrowed $40,000 from the Eastern National Bank of Smithtown, N.Y. (Eastern National), and signed a demand note calling for interest at the rate of 5 percent per annum. The loan was secured by stock owned by Mrs. Marjorie Weston and made available to Brenner for the purposes of the pledge. Part of the consideration for Mrs. Weston's allowing the stock to be pledged was Brenner's agreement to pay her as a fee 4½ percent per annum of the average outstanding balance due by Brenner on the Eastern National loan.

During his employment at Ira Haupt as an account executive, Marjorie Weston, Stephanie Green Peterson, Joseph T. Fish, Eastern National, and Irving Trust Co. were all customers of petitioner.

Beginning in the summer of 1963, and continuing through the middle of November 1963, Ira Haupt loaned a customer some $20 million on American Express warehouse receipts. In late November 1963, the commodities market in which the customer was dealing dropped, and Ira Haupt was forced to sell out the customer's account. As a result of its customer's fraud, the financial debacle known as the "Salad Oil Scandal" ensued, rendering Ira Haupt insolvent. Its liabilities, for which petitioner was jointly and severally liable, exceeded $30 million.

During the week of November 15, 1963, immediately after Ira Haupt failed, Brenner commenced looking for new employment in the brokerage field.

Shortly after the financial collapse of Ira Haupt, Brenner informed his personal creditors, including Marjorie Weston, Stephanie Green Peterson, Joseph T. Fish, Eastern National, and Irving Trust Co., that he intended to make every effort to repay his outstanding loans when and if he became financially able to do so. In keeping with these stated intentions, he commenced repaying Stephanie Green Peterson in 1963.

In December 1963, Brenner was hired by Burnham & Co., a brokerage firm which is a member of the New York Stock Exchange. During his preemployment interview for this position, Brenner told I. W. Burnham, the senior and managing partner of the firm, that he had borrowed money from third parties in order to purchase his interest

in Ira Haupt and that he intended to repay such persons as soon as he "got back on his feet."

During 1963 and 1964, petitioners repaid principal and interest to Brenner's lenders in the following amounts:

| Payee | Amount | Payee | Amount |
|---|---|---|---|
| Eastern National | $10,300.00 | Joseph T. Fish | $3,000.00 |
| Stephanie Green Peterson | 28,013.17 | Irving Trust Co | 8,700.00 |

None of these payments, except those considered interest, was deducted on petitioners' tax return for 1964.

Subsequently, petitioner, as a general partner of Ira Haupt, was adjudicated a bankrupt on a petition filed by him on October 26, 1964, in the United States District Court for the Southern District of New York. On advice of counsel, he filed the petition principally in order to protect himself from the partnership liabilities of Ira Haupt. He was discharged from bankruptcy on March 1, 1965.

During 1965, 1966, and 1967, petitioners made payments on principal and interest to the following creditors:

| Payee | 1965 | | 1966 | | 1967 | |
|---|---|---|---|---|---|---|
| | Principal | Interest | Principal | Interest | Principal | Interest |
| Eastern National | $11,900 | $1,297.08 | $17,800 | $251.35 | 0 | 0 |
| Stephanie Green Peterson | 6,500 | 3,275.00 | 0 | 3,500.00 | 0 | $2,500 |
| Joseph T. Fish | 5,200 | 0 | 6,800 | 0 | $34,000 | 0 |
| Irving Trust Co | 8,400 | 722.76 | 7,900 | 152.08 | 0 | 0 |

During his employment at Burnham & Co., Brenner kept I. W. Burnham informed of the progress he was making in repaying such loans. He became a partner in Burnham & Co. on January 1, 1969. If he had not made a good-faith effort to repay the debts he incurred to purchase the partnership interest in Ira Haupt, it is unlikely that he would have been hired by Burnham & Co. or been made a partner in that company.

Among others, Brenner brought Marjorie Weston, Eastern National, Stephanie Green Peterson, Joseph T. Fish, and Irving Trust Co. as customers to Burnham & Co.

During 1963 through 1968, petitioner earned the following approximate gross commissions from transactions handled on behalf of Burnham & Co.:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1963 | $2,900 | 1966 | $326,000 |
| 1964 | 103,000 | 1967 | 394,000 |
| 1965 | 203,000 | 1968 | 619,000 |

Of the above amounts of gross commissions, Brenner earned approximately 40 percent as his net commission.

As a result of the financial failure of Ira Haupt in 1963, petitioner

suffered a tax loss in the amount of $559,468.11. The excess of deductions over income was carried back to prior years as a net operating loss carryback, and to the extent available, petitioner carried such loss to taxable years subsequent to 1963. No part of the 1963 net operating loss nor any part of the 1963 net operating loss carryback or carryover is in issue in this proceeding.

Petitioners claimed a net operating loss deduction in the amount of $176,065.77 on their income tax return for 1968. Respondent disallowed $112,632.05 of the claimed loss. Of the amount so disallowed, $110,-198.27 remains in dispute and is composed of the payments made by checks, described above, written by petitioners to Eastern National, Irving Trust Co., Stephanie Green Peterson, and Joseph T. Fish during 1965, 1966, and 1967 to repay the remaining principal amounts and interest on the loans extended to buy the partnership interest in Ira Haupt. Additionally, payments made in 1968 to Marjorie Weston and Stephanie Green Peterson totaling $5,530 were deducted by petitioners as interest payments.

Brenner treated the repayments of principal and the payments of interest during 1965, 1966, and 1967, after being discharged of these debts, as ordinary and necessary expenses—incurred in order to preserve his financial reputation on Wall Street—deductible under section 162(a) and considered the payments during 1968 as interest deductible under section 163.[2]

In his notice of deficiency, respondent disallowed these deductions.

## OPINION

Brenner contends that his discharge in bankruptcy relieved him of liability for the debts which he incurred in acquiring the $200,000 interest in Ira Haupt. He urges that he paid those discharged debts in order "to protect his business reputation for financial integrity, to prevent * * * [his] loss of earnings that might result from a destruction of * * * [his] business image, and to protect his credit rating." He maintains that had he failed to make the repayments, he would have lost his professional standing as a securities broker and would not have been able to thrive and prosper as he has on Wall Street. On this ground, he maintains that the payments which he made in 1965, 1966, 1967, and 1968 on the loans extended to enable him to buy the partnership interest in Ira Haupt are "ordinary and necessary" expenses deductible under section 162(a).[3]

---

[2] In their reply brief, petitioners concede that the payments in 1968 are not deductible as interest under sec. 163(a) but argue that they are deductible as ordinary and necessary expenses under sec. 162(a).

[3] Sec. 162(a) reads as follows:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

We think the evidence shows that Brenner's repayments of the loans obtained to enable him to acquire his interest in Ira Haupt were required to protect his reputation for financial integrity and to keep important customers. However, an evaluation of his legal arguments cannot be made by focusing narrowly on those loans as such and the benefits he received from meeting his obligations to his lenders. It is necessary to examine the history of the entire episode of the Ira Haupt losses and the tax treatment accorded them. When that is done, we think it is clear that the claimed deductions are not allowable.

Where a taxpayer borrows money to purchase a capital asset and then loses or disposes of the asset for less than his adjusted basis, the tax consequences of the loss or disposition do not await repayment of the borrowing. The taxpayer is allowed a deduction in the year of the loss or disposition regardless of whether he has repaid the loan. *J. J. Larkin*, 46 B.T.A. 213, 220 (1942), appeal dismissed 129 F. 2d 1020 (C.A. 10, 1942); *Samuel Eugene Bramer*, 6 T.C. 1027, 1033–1034 (1946), affirmed per curiam 161 F. 2d 185 (C.A. 3, 1947), certiorari denied 332 U.S. 771 (1947). Where he later repays the loan, he is not allowed another deduction for the repayment. As was said long ago, "Deductions are not permitted on account of the repayment of loans." *Edwin R. Crawford*, 11 B.T.A. 1299, 1302 (1928). Certainly, the extinguishment of an obligation incurred in order to acquire a capital asset cannot be regarded as an ordinary and necessary expense. *Cripple Creek Coal Co.* v. *Commissioner*, 63 F. 2d 829, 831 (C.A. 7, 1933).

Accordingly, when Brenner borrowed money to acquire his interest in Ira Haupt, he made a capital investment. When Ira Haupt failed, Brenner realized losses for which he has been allowed deductions in accordance with the partnership provisions of the Code. Had Ira Haupt survived, Brenner obviously would not have been entitled to deductions for repayments of the loans regardless of how adversely his failure to repay them would have affected his reputation for financial integrity. We do not think the intervening bankruptcy affects the character of the repayments of the loans.

A discharge in bankruptcy does not pay, satisfy, extinguish, or cancel any debt. The debt itself remains and carries with it a moral obligation to pay it if, as, and when the bankrupt decides to do so. The discharge is remedial in nature. It merely gives the bankrupt a personal defense against enforcement of which he is entitled to avail himself if he sees fit. Or he may waive the defense and honor his moral obligation to pay the debt. The rule was stated long ago in these words in *Zavelo* v. *Reeves*, 227 U.S. 625, 629 (1913):

It is settled * * * that a discharge, while releasing the bankrupt from legal liability to pay a debt that was provable in the bankruptcy, leaves him under a

moral obligation that is sufficient to support a new promise to pay the debt. * * * The theory is that the discharge destroys the remedy but not the indebtedness * * *

See also *Argonaut Insurance Co.* v. *United States*, 193 Ct. Cl. 483, 488, 434 F. 2d 1362, 1364 (1970) ; *Bear Mill Manufacturing Co.*, 15 T.C. 703, 708 (1950) ; *Excelsior Printing Co.*, 16 B.T.A. 886, 888 (1929) ; 8 Remington, Bankruptcy, sec. 3225 (1955).[4] Indeed, under rule 8(c), Federal Rules of Civil Procedure, a discharge in bankruptcy must be affirmatively pleaded as a defense. *Helms* v. *Holmes*, 129 F. 2d 263, 266 (C.A. 4, 1942).

Thus, when Brenner repaid the balance due on the loans he obtained to buy his partnership interest, he merely repaid debts which remained in existence and he still owed despite his bankruptcy.[5] In making these repayments, he was simply waiving a defense which could have been asserted if the lenders had attempted to enforce their claims against him and acknowledging a viable debt to the extent of each repayment. *Abraham Greenspon*, 8 T.C. 431, 434 (1947). The inherent character of the obligations was not changed by the bankruptcy proceeding. Cf. *Stanley H. Klarkowski*, T.C. Memo. 1965–328, affd. 385 F. 2d 398, 400–401 (C.A. 7, 1967) ; *Herbert Brush Manufacturing Co.*, 15 B.T.A. 673, 679 (1929).[6] The deductions, therefore, are not allowable.

Moreover, Brenner has already been allowed deductions for the amounts of the loans. When Ira Haupt suffered the financial collapse in late 1963 leading to the bankruptcy, petitioner became entitled to deduct his distributive share of the partnership losses as determined by the partnership agreement. Secs. 702(a) and 704(a). Although the record does not contain a detailed computation, his deductible loss was limited to the adjusted basis of his interest in the partnership at the end of the partnership year in which the loss occurred. Sec. 704(d). His adjusted basis of his partnership interest, according to section 705 (a), included the $200,000 which he invested in 1963, whether he con-

---

[4] The law on the effect of a discharge in bankruptcy was stated in Nadler, The Law of Bankruptcy, sec. 770 (2d ed. 1970), as follows :

"the legal effect of a discharge is to suspend the right of action, but the debt itself remains and carries with it a moral obligation to pay it, if, as and when the bankrupt may wish to do so.² In other words, when a bankrupt is granted a discharge he is given the legal privilege of either nonpayment of his dischargeable debts, or waiving this legal privilege and accepting his moral obligation to pay them. [Fn. omitted.]"

[5] In fact, with respect to the amounts due Joseph T. Fish and Stephanie Green Peterson, Peggy Brenner was a guarantor and a surety, respectively. The fact that her husband was discharged in bankruptcy did not affect her obligation in any way. Thus, with regard to those loans, she was indebted notwithstanding Brenner's discharge. 8 Remington, Bankruptcy, sec. 3237 (1955) ; *Acme Investors Corp.* v. *Kahan*, 64 N.Y.S. 2d 6 (S. Ct. 1946).

[6] We do not reach respondent's argument that since petitioner realized no taxable income on the discharge of his indebtedness in the bankruptcy proceeding, sec. 1.61–12(b)(1), Income Tax Regs., the loan repayments are nondeductible under sec. 265(1), which denies deductions for expenses allocable to income exempt from taxes.

We point out that, although Brenner invested only $200,000 in Ira Haupt, he already has been allowed deductions of $559,468.11 stemming from that investment, applied against high bracket income, and here seeks another $110,198.27 in deductions.

tributed that amount to the partnership (sec. 722) or purchased some-one else's interest (sec. 742). In addition, his adjusted basis included the increase in his share of the liabilities of the partnership resulting from its failure. Sec. 752(a).

The parties have stipulated that petitioner suffered a tax loss of $559,468.11 in 1963 as a result of the financial failure of Ira Haupt. This loss was carried back to prior years and forward to subsequent years as a net operating loss, and petitioners have realized the full tax benefit thereof. Since the amount of the allowed net operating loss deduction was limited to Brenner's adjusted basis in his partnership interest in Ira Haupt and his adjusted basis includes his $200,000 investment, he has already obtained, in substance, a deduction for the $200,000.

To allow Brenner to deduct the repayments of the loans obtained to acquire the Ira Haupt interest would allow him "the practical equivalent of a double deduction." *Ilfeld Co.* v. *Hernandez*, 292 U.S. 62, 68 (1934). The Code "should not be interpreted" to allow double deductions for the same amount "absent a clear declaration of intent by Congress," *United States* v. *Skelly Oil Co.*, 394 U.S. 678, 684 (1969), rehearing denied 395 U.S. 941 (1969), and we do not think section 162(a) reflects any such intent.

Petitioner has cited a long list of cases in which deductions were allowed for debt payments as ordinary and necessary expenses under either section 162(a) or one of its predecessors, but in each of these cases the debts which were paid were the obligations of someone other than the taxpayer. *Lutz* v. *Commissioner*, 282 F. 2d 614 (C.A. 5, 1960) (debts of corporation which taxpayer was bound to pay if he were to continue in business); *Allen* v. *Commissioner*, 283 F. 2d 785 (C.A. 7, 1960) (payment of $10,000 to general creditors of a corporation to protect taxpayer's reputation and credit standing); *Dunn & McCarthy* v. *Commissioner*, 139 F. 2d 242 (C.A. 2, 1943) (payment by taxpayer-corporation to its employees of debts owed by deceased president); *Samuel R. Milbank*, 51 T.C. 805 (1969) (debt guaranteed by corporation owned by taxpayer and his brother); *C. Doris H. Pepper*, 36 T.C. 886 (1961) (loans to a client arranged by taxpayer-attorney); *Scruggs-Vandervoort-Barney, Inc.*, 7 T.C. 779 (1946) (payments by retail store to depositors of a defunct bank located on store's premises); *L. Heller & Son, Inc.*, 12 T.C. 1109 (1949) (payment of debts of a subsidiary reorganized under section 77B of the Bankruptcy Act); *James L. Lohrke*, 48 T.C. 679 (1967) (payment of loss incurred by a customer of a corporation which held a license to a patent owned by taxpayer); *Charles J. Dinardo*, 22 T.C. 430 (1954) (payment by taxpayer-doctors of operating deficits of a

hospital which aided their practice). In each of those cases, the courts found that the repayment of the debt of another individual or corporation was necessary to protect the business interests of the taxpayer. On this ground, they are clearly distinguishable from the present case where the taxpayer seeks the deduction for the payment of his own debts.

The only case we have located in which a deduction was allowed a taxpayer for the repayment of its own debts is *A. Harris & Co.* v. *Lucas*, 48 F. 2d 187 (C.A. 5, 1931), reversing 16 B.T.A. 705 (1929). In that case, the taxpayer found itself in financial straits in 1916, and under a composition agreement its debts were discharged by payments of 50 cents on the dollar. Later, finding its credit rating impaired, the taxpayer paid the debts in full, and the Court of Appeals allowed deductions for the payments as ordinary and necessary expenses within the meaning of the predecessor of section 162(a). However, the taxpayer had reported as taxable income the amount of the debts which were forgiven under the composition agreement. Thus, the taxpayer in that case did not receive a double tax benefit. The effect of the court's decision was merely to allow an adjustment to offset the amount taken into income in the year of the composition arrangement.

We hold that the repayments of the loans made to petitioner to enable him to acquire his interest in Ira Haupt are not deductible.[7]

*Decision will be entered under Rule 155.*

---

[7] If Brenner's obligations to his personal creditors persisted notwithstanding the bankruptcy, as we have held, his payments of interest on the loans constituted the discharge of acknowledged obligations and are deductible under sec. 163. Petitioner's concession as to the 1968 payments deducted on his return as interest, referred to in fn. 2, is not clear as to whether it was made on the assumption that all the payments were deductible under sec. 162(a) or that all interest obligations had been previously discharged. The Rule 155 computation may take into account any sec. 163(a) interest deductions allowable under the loan instruments.