MARSHALL P. SAFIR AND GLADYS SAFIR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Safir v. Commissioner
Docket No. 8375-78.
United States Tax Court
T.C. Memo 1982-123; 1982 Tax Ct. Memo LEXIS 624; 43 T.C.M. (CCH) 757; T.C.M. (RIA) 82123; March 15, 1982. Marshall P. Safir, pro se. Laurence D. Ziegler, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the year 1974 in the amount of $ 11,300. After a concession, [1] the only issue for decisio is whether petitioners are entitled to a bad debt deduction under section 166 or a loss deduction under section 165. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation *626 of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Marshall P. Safir and Gladys Safir resided in Great Neck, New York, at the time they filed their petition in this case. Pursuant to an automatic extension, they timely filed their joint Federal income tax return for the year 1974 with the Internal Revenue Service Center in Holtsville, New York. Petitioner Gladys Safir is a party to this proceeding solely because she filed a joint return with her husband, and the term petitioner will hereinafter refer to Marshall P. Safir. Throughout the period 1965 through 1974, petitioner was involved in a number of separate businesses, including Pioneer Overseas Corporation (POC), Pioneer Warehouse Corporation (PWC), and Sapphire Steamship Lines, Inc. (SSL). Sometime prior to the end of 1965, petitioner invested in POC, a company that shipped military supplies and other goods overseas on various shipping lines that it hired for that purpose. By the end of 1965, petitioner owned 100 percent of the outstanding stock of POC. Petitioner was also the sole shareholder of PWC. The record does not show the nature of PWC's business activities or *627 the relationship, if any, that existed between PWC and POC. On February 10, 1965, petitioner and a business associate, Arnold Weissberger, incorporated SSL under Delaware law. Petitioner and Weissberger formed SSL to operate as a common carrier of United States Government goods and other commodities, including goods shipped by POC, in the North Atlantic. During all relevant times herein, petitioner and Weissberger each owned 50 percent of the outstanding stock of SSL. From February 10, 1965, through January 1, 1966, SSL was in a pre-operating phase, attempting to qualify as a carrier of United States Government goods and to accumulate funds necessary for its start-up expenses. SSL was capitalized as follows: (1) petitioner and Weissberger contributed $ 10,000 in the form of equity when they organized SSL, and (2) close friends and family members of petitioner and Weissberger advanced $ 750,000 in the form of debt on or before January 1, 1966. Some of these advances were made directly to SSL, and others were made to petitioner, Weissberger, or various companies owned by petitioner and Weissberger. Those advances that were not made directly to SSL apparently were contributed *628 to SSL by the particular recipient of the funds. Although the advances were made to several different recipients, there was no designation of who (petitioner, Weissberger, SSL, or others) was to repay the various advances. On October 8, 1965, petitioner borrowed $ 50,000 for start-up costs of SSL. He borrowed the money from two corporations whose president, Burton J. Bookstaver, had been a close personal friend and business associate for many years. Petitioner borrowed $ 25,000 by signing a promissory note in the amount of $ 25,000 bearing six percent interest from the date of the note. The note was payable to Bookstaver Associates, Inc., on demand on or after December 15, 1965. Petitioner borrowed the other $ 25,000 by executing a promissory note with identical terms, but payable to Bookstaver & Co., Inc. Neither of these notes mentioned SSL, showed any liability on the part of SSL, or provided for any liability of petitioner as a guarantor. Petitioner as the maker of the notes was personally liable for repaying them. In January of 1966, SSL commenced operations with the purchase of three vessels that it had previously chartered. A tentative statement of income and loss *629 prepared by Arthur Andersen & Co. for SSL for the period January 1, 1966, through March 31, 1966, showed shareholders' equity of $ 750,000 and a net loss of $ 221,964 during that three-month period. [3] However, SSL was driven out of business quickly. On or about March 11, 1967, SSL filed a Chapter XI bankruptcy petition under Title 11, U.S.C. sec. 721, etseq. (1971). On April 4, 1967, the Secretary of the SSL Creditors Committee sent a letter to the creditors of SSL notifying them of the filing of the Chapter XI bankruptcy petition. Sometime during April of 1967, SSL was adjudicated a bankrupt and a liquidation bankruptcy proceeding was commenced. *630 During 1967, petitioner received wages of $ 2,166.66 from SSL. On his income tax return for 1967, petitioner reported that income and also reported a short-term capital loss of $ 25,228.48 for an "Investment in Sapphire Steamship Lines (Bad Debt)." The record does not disclose the nature of the loss or bad debt that petitioner deducted in 1967. After SSL went into bankruptcy, most of petitioner's friends and family members who had made advances filed claims against SSL in bankruptcy court. Burton J. Bookstaver served on the Creditors Committee that was appointed in the bankruptcy proceeding. Between 1970 and 1973, SSL was involved in antitrust and other Federal court litigation in which there was a strong possibility of recovery. Because of that possibility, petitioner entered into oral agreements with friends and family members who had loaned funds either to SSL or to himself. Petitioner orally agreed to repay their advances and requested that in return they assign to him their claims to any recovery from SSL. The last date for filing proofs of claim in the SSL bankruptcy proceeding was October 28, 1967. Petitioner did not file any proof of claim in the SSL bankruptcy *631 proceeding. Neither Burton J. Bookstaver nor his corporations filed any proof of claim in that proceeding. Neither Bookstaver nor his two corporations had ever advanced any funds to SSL or had any other claims against SSL. [4]
On December 21, 1967, after the final date for filing claims against SSL, Bookstaver wrote a letter to petitioner asking for payment of the two $ 25,000 *632 loans made to him in 1965 by Bookstaver & Co., Inc., and Bookstaver Associates, Inc. On September 9, 1970, Bookstaver wrote to petitioner and again requested payment of the $ 50,000 indebtedness due to his two corporations. On September 15, 1970, petitioner wrote a letter to Bookstaver in which he promised to repay the $ 50,000 loan and enclosed two series of notes payable by him to each corporation. These notes were to replace the notes that petitioner had given to the corporations on October 8, 1965. [5]
Petitioner repaid the advances from Bookstaver's corporations with funds *633 from his wholly-owned corporation, PWC. He charged these amounts either to his drawing account or to his loan account at PWC. Petitioner made total repayments of principal and interest of $ 55,000 by checks drawn on PWC as follows: Amounts Paid to
Amounts Paid to
Year
Bookstaver & Co., Inc.
Bookstaver Associates, Inc.
1970
$ 2,500
$ 2,500
1971
6,000
6,000
1972
6,000
6,000
1973
6,000
6,000
1974
6,000
6,000
1975
1,000
1,000
$ 27,500
$ 27,500
Sometime during 1972 or 1973, the antitrust case involving SSL was settled. The proceeds from the antitrust settlement (1) exceeded the creditors' claims against SSL, (2) were paid to the trustee in bankruptcy in the SSL proceeding, and (3) were still undistributed at the time of the trial in this case. On the date of this trial, the SSL liquidation bankruptcy proceeding was still pending in the United States District Court, Southern District of New York. The recovery in the antitrust case exceeded $ 2,400,000. On their 1974 joint Federal income tax return, petitioners claimed a business bad debt deduction of $ 53,000. In his statutory notice of deficiency, respondent disallowed petitioners' *634 claimed deduction for a business bad debt loss of $ 53,000 in full, with the following explanation: The deduction of $ 53,000.00 shown on your return as a business bad debt resulting from your acts as a guarantor of loans obtained by Sapphire Steamship Lines, Inc. from third parties is not allowable because it has not been established that the debt became worthless during the taxable year 1974. If, however, it is established that the debt became worthless during 1974, the debt is a non-business bad debt and the loss is subject to the limitations of Section 1211 of the Internal Revenue Code. In a letter dated September 26, 1980, respondent's counsel advised petitioners that in addition to the grounds for disallowance set forth in the statutory notice, it was respondent's position that petitioner was not liable as a guarantor of the indebtedness but was personally liable on the debt, so that his repayment of the amount due did not constitute a bad debt. OPINION The only question for decision is whether petitioner is entitled to a deduction in 1974 for either a business or theft loss under section 165 or a bad debt under section 166 for loan repayments *635 made from 1970 through 1974 to Bookstaver's corporations. A loss cannot be both a business loss within the meaning of section 165 and a bad debt within the meaning of section 166. Putnam v. Commissioner,352 U.S. 82 (1956); Spring City Foundry Co. v. Commissioner,292 U.S. 182, 189 (1934); Proesel v. Commissioner,77 T.C. 992, 1001 (1981). Therefore, we must first determine whether section 165 or section 166 governs the deductibility of any loss that may have been sustained by petitioner due to his repayment of loans from Bookstaver's corporations. Section 166(a) provides that a deduction shall be allowed with respect to any debt that becomes worthless during the taxable year. Section 1.166-1(a), Income Tax Regs., specifically limits the types of obligations for which deductions are allowable under section 166 to bad debts "owed to the taxpayer." Section 1.166-1(c), Income Tax Regs., requires *636 that the bad debt owed to the taxpayer must be a bona fide debt that arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Section 1.166-1(c), Income Tax Regs., further provides that a gift or contribution to capital from the taxpayer does not constitute a debt for purposes of section 166. In the present case, the $ 50,000 that petitioner borrowed from Bookstaver's corporations for start-up costs of SSL did not give rise to any bad debt owed by a third party to petitioner, as required by section 166 and the regulations thereunder. On October 8, 1965, petitioner executed separate promissory notes in the amount of $ 25,000 to each corporation. Petitioner as the maker was personally liable on these notes. Neither of these notes mentioned SSL, showed any liability on the part of SSL, or provided for any liability of petitioner as a guarantor. There is no evidence in the record to suggest that SSL was ever liable on these notes. All of the evidence shows that petitioner alone was liable on the notes, and that it was to petitioner alone that Bookstaver and his corporations looked *637 for payment. Furthermore, there is no evidence showing that petitioner ever loaned the funds he borrowed from Bookstaver's corporations or any other funds to SSL. The facts do not show any bona fide debt owed by SSL to petitioner. It appears that petitioner's use of these funds for start-up costs of SSL constituted contributions to capital by petitioner to SSL, which do not qualify as debt for purposes of section 166. Sec. 1.166-1(c), Income Tax Regs. Nor is the result changed by the replacement notes issued in 1970 to replace these 1965 notes. Again, petitioner was the maker of and primary obligor on the 1970 notes. As before, the 1970 notes represented petitioner's personal indebtedness to the Bookstaver corporations. See footnote 5. There was no debt "owed to the taxpayer" and hence no bad debt. [6] Therefore, petitioner is not entitled to a bad debt deduction under section 166 for his repayments of personal loans made to him by Bookstaver's corporations. Petitioner's repayments are deductible, if at all, under section 165. *638 Section 165(a) allows a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. Section 165(c) limits allowable loss deductions for individuals to (1) losses incurred in a trade or business, (2) losses incurred in any transaction entered into for profit and not connected with a trade or business, and (3) losses of property not connected with a trade or business and arising from fire, storm, shipwreck, or other casualty, or from theft. In order for a loss to be deductible under section 165(a), it must be evidenced by a closed and completed transaction, fixed by identifiable events, and actually sustained during the taxable year. Sec. 1.165-1(b) and 1(d), Income Tax Regs.
Petitioner argues that his repayment of personal loans to Bookstaver's corporations constitutes a deductible loss under section 165(c)(1), (c)(2), or (c)(3). However, petitioner is not entitled to a loss deduction under section 165 for repaying money he has borrowed. Generally, *639 where a taxpayer borrows money to invest in a business or other venture and suffers a loss on his investment, the tax consequences of that loss do not await repayment of the borrowed money. Instead, the taxpayer must take his deduction in the year the loss in the business or other venture was actually sustained, regardless of whether he has repaid the loan. Crain v. Commissioner,75 F. 2d 962, 964 (8th Cir. 1935); Brenner v. Commissioner,62 T.C. 878, 883 (1974); Granan v. Commissioner,55 T.C. 753, 755 (1971); Weis v. Commissioner,13 B.T.A. 1284, 1289 (1928); Crawford v. Commissioner,11 B.T.A. 1299, 1302 (1928). If the taxpayer fails to take his deduction in the year the loss is sustained, he loses it. [7]
*640 As the above cases show, petitioner does not get a deduction for repaying money he borrowed even if he used those funds to invest in SSL. His deduction, if any, must relate to his investment in SSL. The fact that he acquired the funds for that investment in SSL by a loan on which he was personally liable does not preclude his recognition of any loss on that investment before he has repaid the loan. Proesel v. Commissioner,supra at 1004. On this record, we hold that petitioner's loss, if any, did not occur in 1974. If we view the loss as a loss on his equity investment in SSL, it is doubtful that any such loss has yet occurred. A loss must be fixed by identifiable events and actually sustained during the taxable year. Sec. 1.165-1(b) and (1)(d), Income Tax Regs. The bankruptcy proceeding involving SSL has not yet been concluded. There are proceeds exceeding all creditors' claims, proceeds of over $ 2,000,000 yet to be distributed. Petitioner, having bought up some of the creditors' claims and as owner of 50 percent of the stock, may yet realize a gain on his *641 investment in SSL. On the other hand, if petitioner sustained a loss as a creditor of SSL, then any such loss occurred in 1967 when petitioner failed to file a proof of claim in the bankruptcy proceeding, as will be discussed below. The basis for petitioner's claimed deduction in 1974 was an alleged agreement between him and Bookstaver under which he agreed to repay the $ 50,000 of advances plus interest, and Bookstaver orally promised to assign to petitioner any claims that he or his corporations had against SSL. Petitioner contends that since Bookstaver was a close friend and a member of the SSL Creditors Committee in the bankruptcy proceeding, he never found it necessary to check the bankruptcy records to determine whether or not Bookstaver or his corporations had ever filed a claim against SSL. Petitioner argues that he discovered that there was no claim on file by either Bookstaver or his corporations in 1974, and that he therefore deducted the amounts he repaid to the corporations from 1970 through 1974 on his 1974 tax return. As discussed earlier, Bookstaver's corporations loaned the $ 50,000 directly to petitioner, and petitioner was personally liable for repaying *642 that amount. There is no evidence in the record showing that either Bookstaver or his two corporations ever advanced any funds to SSL or ever had any other claims against SSL. In April of 1967, SSL was adjudicated a bankrupt, and a liquidation bankruptcy proceeding was commenced. The last date for filing proofs of claim in the SSL bankruptcy proceeding was October 28, 1967. On that date, there were no proofs of claim on file in the SSL bankruptcy case by Bookstaver, Bookstaver's corporations, or petitioner. We think it likely that if petitioner had had any claim against SSL, apart from his ownership interest in the corporation, he would have filed a claim in the bankruptcy proceedings on his own behalf. He failed to do so by the last date for filing on October 28, 1967. [8]
We therefore hold that petitioner's loss, if any, with respect to the $ 50,000 borrowed from Bookstaver's corporations did not occur in 1974. Any loss *643 sustained by petitioner as a creditor of SSL occurred in 1967; any loss sustained by him in regard to his equity interest in SSL has not yet occurred. Neither do we find any merit in petitioner's contention that Bookstaver's failure to assign to petitioner his "claims" against SSL, as he allegedly promised to do in return for petitioner's repayment of loans to him, in any way constituted a theft under section 165(c)(3) and (e). Section 1.165-8(d), Income Tax Regs., defines "theft" as an act deemed to include and not necessarily limited to larceny, embezzlement, and robbery. Petitioner raised the theft loss claim for the first time in his post-trial memorandum. There are no facts in the record to support such a claim. Bookstaver's corporations loaned the $ 50,000 to petitioner in the first place, and Bookstaver simply wanted the loans repaid so that he could get his money back. In 1970, long after the deadline for filing any claims in the bankruptcy proceeding, petitioner gave Bookstaver new notes for the $ 50,000 plus interest. The 1970 replacement notes, like the 1965 notes, related to money petitioner borrowed from Bookstaver's corporations. *644 The record does not show that Bookstaver and his two corporations ever had any claims against SSL. Petitioner may have tried after the fact to recast his own obligation on his own indebtedness into the form of an indebtedness of SSL, but Bookstaver's failure to go along with such an effort would not result in a theft loss. Decision will be entered for the respondent.
Footnotes
1. Petitioners conceded that respondent's disallowance of $ 1,331 of a claimed casualty loss deduction of $ 2,335 was correct. There was also an automatic adjustment to petitioners' medical expense deduction as a result of increases in their adjusted gross income. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year here involved.↩
3. Arthur Andersen & Co.'s statement of income and loss for SSL was tentative because SSL had not yet obtained financing for the construction of certain vessels and because it could not be determined whether subsequent revenues from the operations of such vessels would be sufficient to absorb all costs. Petitioner insists that the $ 750,000 shown as shareholders' equity was really the earlier loans from friends and family members, and was shown as equity merely to provide "a meaty backup" or "a beef-up of the company" for purposes of certain Government subsidies SSL was then trying to obtain.↩
4. Petitioner testified that in 1970 he agreed to repay the $ 50,000 of advances from Bookstaver's two corporations in return for Bookstaver's oral promise to assign any claims that he or his corporations had against SSL. However, the record shows that the corporations had made those advances to petitioner in his individual capacity and not to SSL. In spite of his alleged agreement with Bookstaver, petitioner never checked the bankruptcy records to determine whether or not Bookstaver or his corporations had ever filed any claim against SSL. Although Bookstaver was a member of the SSL Creditors Committee early in the bankruptcy proceeding, there is no evidence in the record showing that either Bookstaver or his two corporations ever advanced any funds to SSL or ever had any other claims against SSL.↩
5. Petitioner testified that these notes were given in connection with petitioner's oral agreement with Bookstaver to pay off the loan in exchange for an assignment of Bookstaver's claim against SSL in the bankruptcy proceeding. We think it significant that Bookstaver's letters of December 21, 1967, and September 9, 1970, and petitioner's letter of September 15, 1970, regarding repayment of the loan made no reference to SSL. We reject petitioner's self-serving testimony insofar as it attempts to characterize these notes as something other than petitioner's own obligation on his own indebtedness.↩
6. If, as petitioner seems to urge, the transaction could somehow be recast and treated as if petitioner had loaned money to SSL or as if petitioner had guaranteed a loan made to SSL, any resulting bad debt deduction in this case would still be limited to a nonbusiness bad debt deductible only as short-term capital loss. United States v. Generes,405 U.S. 93 (1972); Whipple v. Commissioner,373 U.S. 193 (1963); Putnam v. Commissioner,352 U.S. 82 (1956); Eisenberg v. Commissioner, 78 T.C.     (March 3, 1982); Benak v. Commissioner,77 T.C. 1213 (1981); Shinefeld v. Commissioner,65 T.C. 1092↩ (1976). We of course cannot recast the transaction and must decide the case on the basis of the existing facts.
7. If petitioner's theory were the law, taxpayers could take double deductions, once for the actual investment loss and again for the repayment of the money borrowed to finance the investment. Crain v. Commissioner,75 F. 2d 962, 964 (8th Cir. 1935); Brenner v. Commissioner,62 T.C. 878, 884-885 (1974); Granan v. Commissioner,55 T.C. 753, 755↩ (1971). That of course is not the law.
8. We note that petitioner deducted a short-term capital loss of $ 25,228.48 on his 1967 tax return due to an unspecified "Investment in Sapphire Steamship Lines (Bad Debt)." This lends support to our conclusion that any such loss occurred in 1967.↩