ESTATE OF ERIC D. HIRSCH, DECEASED, LEAH A. HIRSCH, EXECUTRIX, AND LEAH A. HIRSCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Hirsch v. Commissioner
Docket No. 13984-80.
United States Tax Court
T.C. Memo 1983-371; 1983 Tax Ct. Memo LEXIS 418; 46 T.C.M. (CCH) 559; T.C.M. (RIA) 83371; June 22, 1983. *418 Held: Losses in commodity futures trading through a joint venture are deductible when incurred even though funds for margin requirements and to make good the losses were borrowed. Ronald S. Board and Martin H. Aussenberg, for the petitioners. Isham B. Bradley,Robert B. Nadler *419 and Vallie C. Brooks, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar year 1976. Due to concessions, [1] the principal issue relates to whether or not petitioners incurred short-term capital losses from trading in commodity futures in the years 1973 through 1975 in excess of the amount allowed by respondent to be carried forward to the year 1976. Petitioners also claim that respondent should be estopped from changing his position to petitioners' detriment. However, we do not reach this subsidiary issue due to our resolution of the principal issue. Finally, petitioners claim that the capital gain reported on their 1976 return was inadvertently overstated. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The parties have stipulated that at the time the petition was filed petitioners [2] resided in Memphis, Tennessee. For the calendar years 1973 through 1976, Mr. and Mrs. *420 Hirsch filed joint Federal income tax returns on the cash basis method of accounting. During the years involved, the business activities of Mr. Hirsch, certain of which generated the issue before the Court, centered around a family-owned corporation, Allenberg Cotton Company, Inc. (ACC), a Tennessee corporation, which had been engaged in the business of merchandising cotton since approximately 1946. In general, its activities consisted of the purchase of cotton from farmers and cotton gins and the resale of ginned cotton to mills all over the world. During the period 1973 through 1975, more than 70 percent of the outstanding shares of stock of ACC were owned by various members of the Hirsch family, including in-laws and family trusts, with the balance owned by unrelated ACC employees. Mr. Hirsch had been the chief executive officer of ACC for years but by 1973 was semi-retired and the business was then being actively managed by his son-in-law, Ben K. Baer. Several affiliated business entities need to be identified. Allenberg *421 International Cotton Company, Inc. (AICC), a Tennessee corporation, and Allen Warehouse Company of California, Inc. (Warehouse), a California corporation, were affiliated with ACC, the outstanding stock being held by substantially the same individuals as ACC and in substantially the same proportions. Algodonera Commercial Allenberg, S.A. (ACASA), a Mexican corporation, was a wholly owned subsidiary of AICC. For many years, Mr. Hirsch had engaged in speculative trading in cotton futures on the New York Cotton Exchange (the Exchange) and was reputed to be an experienced and successful trader. Part of this trading should be classified as hedging for the benefit of ACC and part had always been speculation for profit. Hedging essentially consisted of the sale or purchase of cotton futures to protect ACC against excessive loss through price changes on cotton which it had purchased or sold. Such hedging was required by ACC's banks. During the period 1973 through 1975, hedging was carried out by Mr. Baer and speculation by Mr. Hirsch. There appears to be nothing unique about futures trading in this period through the Exchange. The Exchange used the Commodity Clearing Corporation *422 (CCC) as its clearinghouse. A trader (unless he was a member of the Exchange) was required to use a broker which was a member. The Exchange and CCC dealt with and recognized only the member brokers, who were required to abide by the rules established by the Exchange. Each broker was required to keep on deposit a sufficient sum of money, referred to as "original margin," to cover one day's maximum variation in contracts purchased that day. During this period the maximum amount by which the price of futures was permitted by the Exchange to vary in a single day was 2 cents per pound. Since each contract involved 100 bales of cotton weighing 500 pounds each, the original margin was $1,000 per contract, less any credits with respect to closed contracts. In addition, each broker on a daily basis was required to make deposits or received credit, as appropriate, to cover the net effect of market fluctuations on all contracts of all customers. This was referred to as "marking to the market" or "market margin." When a trader such as Mr. Hirsch made a trade on the Exchange, his broker would be directed to purchase or sell one or more contracts. Each contract required delivery of cotton *423 at a specified time in the future. Each purchase contract, which established a "long" position, had to be matched by another trader who, through his broker, was willing to sell cotton, a "short" position, at the same price and on the same delivery date. The purchases and sales were not actually consummated by delivery of cotton. Instead, a transaction was closed by the purchase or sale of an offsetting contract. When that was done, an "open" position was "closed." Thus, a single transaction required two traders, a buyer and a seller, each represented by a broker. Occasionally, an excess of purchase or sell orders had to be accumulated and held until matching orders were available. Before the close of business each day the brokers initialed each other's cards or transaction memoranda. While a trader in the usual case would have no contract with his counterpart or with the second broker, every trade was in fact a two-part transaction. Reports were made to the Exchange on a daily basis or more frequently, so that margin deposits might be called for by CCC. Since the Exchange did not recognize individual traders or customers of brokers, it netted each broker's contracts, leaving *424 to the broker the making of appropriate arrangements with customers. Both Mr. Hirsch and Mr. Baer had followed and continued during 1973 through 1975 to follow these normal commercial practices in their hedging transactions for ACC as well as in pure speculation on the Exchange. The final entity involved in this case is Allenberg Brokerage Company (ABC), a partnership formed in 1968 solely to act as a member-broker of the Exchange to handle the transactions of ACC, its affiliated corporations, and its stockholders and employees. At that time, the rules of the Exchange precluded membership by a corporation. During the years in issue, Messrs. Hirsch and Baer were the partners, purporting to share profits and losses in the ratio of 45 percent and 55 percent. That, however, was largely window dressing, it never being contemplated that ABC would make (or presumably lose) any significant sums. In fact, its profits were minimal. Its source of capital was ACC, which provided its executive management. ABC was later incorporated. [3]
*425 In 1972, Mr. Baer determined that it would be useful for Warehouse and ACASA to take advantage of Mr. Hirsch's expertise as a futures trader in an attempt to generate profits to repay loans and offset business losses. Accordingly, a written agreement was made in 1972 between Warehouse, ACASA and Mr. Hirsh pursuant to which Mr. Hirsch was to engage in speculative futures trading on the Exchange with the profits and losses to be shared in the proportions of 60 percent for Mr. Hirsch, 10 percent for Warehouse and 30 percent for ACASA. The trading was to be handled through ABC and through a single combined account known as the "6-1-3 Account." This account was treated as a separate customer of ABC. The agreement was as follows: In consideration of the mutual benefits which may arise, the undersigned hereby authorizes Eric D. Hirsch or his appointed delegate to purchase and sell cotton futures through the New York Cotton Exchange with each party responsible for his (its) share of the profit or loss that may result in such trading as follows: Eric D. Hirsch
60%
Allen Warehouse Company of California
10%
Algodonera Commercial Allenberg, S.A.
30%
The trading may *426 be done with one or more brokers and will be known as the "6-1-3 Account". This agreement shall not be considered as a joint venture. The combination of the account is merely to facilitate the handling of one transaction for the three parties rather than three separate transactions. The agreement does not restrict the trading of the parties and they may trade separately with other accounts. ACC agreed to loan and did loan to the three parties without interest the capital required for this speculation. Trading by Mr. Hirsch pursuant to the agreement commenced in 1972 and continued into 1974. Mechanically, ACC supplied the funds needed for the margin requirements through its New York City bank at the direction of or through direct drafting on ACC by ABC employees. Detailed records were maintained by ABC and by ACC showing ABC's total trading activity by its various accounts and customers, including the 6-1-3 Account as a separate specific customer. The executive officers of ACC and Mr. Hirsch were each kept aware daily of the cumulative results of the latter's speculation for the 6-1-3 Account. Unfortunately, the speculation in 1973 was largely unsuccessful. By January 31, 1974, Mr. *427 Hirsch's indebtedness to ACC, reflecting his cumulative losses, including prior individual trading, was approximately $1,890,000. Based upon the entire record, and despite some apparent inconsistencies between the stipulated facts (including documents) and the testimony, we find that no indebtedness was created between Mr. Hirsch (or Warehouse or ACASA) and ABC other than the temporary obligation to cause the 6-1-3 Account to post original or market margin, which obligation ACC discharged on a daily basis in accordance with its agreement with the three participants in the 6-1-3 Account. Similarly, any obligation of the 6-1-3 Account to ABC was satisfied on a daily basis by ACC. ABC neither intended to lend money to the 6-1-3 Account or its participants nor did it have the financial capacity to do so. [4]
*428 Warehouse withdrew from the 6-1-3 Account as of December 31, 1973. As of January 31, 1974, by bookkeeping entries the debt of Mr. Hirsch then reflected on ABC's books was transferred to ACC's books. As of February 1, 1974, a new account, styled 7-3 Account, was established with Mr. Hirsch holding 70 percent and ACASA 30 percent but with Mr. Hirsch's profits in fact being diverted largely to ACC in liquidation of his indebtedness. Following termination of the 6-1-3 Account activity in January 1974, Mr. Hirsch delivered all of his assets to ACC in partial liquidation of his indebtedness of $1,890,291.49 pursuant to a written agreement with ACC dated February 1, 1974. After taking into account the estimated value of his assets, ACC concluded that $600,000 should be written off as a bad debt, although that sum was reflected by a promissory note signed by Mr. Hirsch. During its fiscal years ending January 31, 1974, 1975 and 1976, ACC wrote off as had debts owed by Mr. Hirsch in the aggregate slightly over $1,300,000. ACC's books reflect that ACC realized from Mr. Hirsch's assets the sum of $516,611.07. Petitioners claimed loss carryovers to the year 1976 of $1,418,453. Respondent *429 allowed only $516,611.07 of this amount, reflecting the amount collected by ACC. Petitioners assert that ACC received an additional sum of $334,062 as a result of Mr. Hirsch's subsequent trading activities pursuant to the February 1, 1974, agreement and subsequent agreements. The record is inconclusive on this issue and we do not need to resolve that question in view of our disposition of this case. We further find that petitioners made a mathematical error in reporting the gain on the redemption of Mrs. Hirsch's ACC stock on their 1976 return. The gross redemption proceeds received by Mrs. Hirsch amounted to $1,025,443, representing the difference between the agreed value of the Mexican properties viz., $1,384,437, and the promissory note in the amount of $358,994 given by Mrs. Hirsch to the other redeeming shareholders to equalize values. OPINION This case is a typical example of unsuccessful speculation in commodity futures using borrowed funds. Most of the material facts are not in dispute. The issue to be decided is the consequence for tax purposes of the utilization of borrowed funds to the extent not repaid during the period 1973 through 1975. There are two well *430 established rules to be considered here, but their application is not always easy. One stemming from a U.S. Supreme Court decision in 1931 is that a taxable loss does not occur when a taxpayer on a cash basis merely discharges the obligation out of which the loss arose by the giving of his promissory note. A loss in that circumstance is recognizable only in the year or years in which the note is paid. Thus, in Helvering v. Price,309 U.S. 409 (1940), a bank stockholder executed an agreement of guaranty which he discharged by the giving of his note. The Supreme Court, on the authority of its earlier decision in Eckert v. Burnet,283 U.S. 140 (1931), held that no taxable loss was incurred. Deduction would have to await a cash payment. The second rule holds that a loss is recognizable in the year the loss transaction is incurred even if the transaction is entered into with borrowed funds. Larkin v. Commissioner,46 B.T.A. 213 (1942). [5] In Larkin, the petitioner used money he had borrowed from a bank to purchase shares of stock. The stock was pledged as collateral, the pledge foreclosed by the bank and the stock sold for almost *431 nothing. In a later year, a payment was made on the note he had given the bank.We held that the loss occurred when the stock became worthless; the borrowing was a separate transaction. Petitioners claim the Larkin rule applies here because this case involves the purchase of commodities, i.e., cotton, by petitioners with borrowed funds. Respondent, however, sees the first rule as controlling. He relies primarily on Bramer v. United States,259 F.2d 717 (3d Cir. 1958), and Page v. Rhode Island Hospital Trust Co.,88 F.2d 192 (1st Cir. 1937), both of which denied the taxpayer a deduction for losses on sales of stock until the taxpayer discharged its obligation to pay the broker for margin requirements not initially satisfied. On the facts of this case, we believe petitioners have chosen the proper rule of law to apply. Respondent is led astray in this case as a result of his misinterpretation of the facts. Respondent would have us find that the 6-1-3 Account trading activities were financed by loans from ABC to the account or to *432 the account participants. On this basis he argues that Mr. Hirsch's obligation ran only to the broker, ABC, and that he had no contractual relationships with independent third parties. We have found, however, that the agreement made by Mr. Baer on behalf of ACC contemplated loans by ACC to Mr. Hirsch (and to Warehouse and ACASA) of necessary funds for the commodity speculation by the 6-1-3 Account. The fact that ACC chose to directly provide funds either to ABC or to CCC as the clearinghouse for the Exchange, which was the path it routinely used when trading on the Exchange for its own account, cannot change the fact that the loans were made by ACC to the account participants themselves, not to ABC. Moreover, as our findings of fact indicate, Mr. Hirsch, as a typical trader dealing through a broker, did enter into purchase and sale transactions with unrelated third parties. Respondent further contends that a commodity futures contract has no intrinsic value, that it is not intangible property having intrinsic worth. We disagree. As we said many years ago in Covington v. Commissioner,42 B.T.A. 601 (1940), affd. 120 F.2d 768 (5th Cir. 1941), commodity *433 futures contracts are property, and losses from trading in futures are losses incurred in the sale or exchange of capital assets. We find no significant difference between the futures trading in Covington and that involved in this case. And more recently, we have reaffirmed our holding in Covington that transactions entered into under normal commercial practices in a commodity futures market constitute sales or exchanges. Vickers v. Commissioner,80 T.C. 394 (1983). It is clear from Covington and Vickers that the sale or exchange transaction is that which is entered into by the trader or customer through the broker as agent on the commodity exchange with another person similarly trading through his or its broker on the same exchange. As we have found, for every purchaser of a futures contract, there must be a seller; there cannot be a short sale unless there is an equivalent long purchase. Thus, a sale or exchange should exist regardless of whether the trader furnishes his own capital or borrows it from a bank or even from hi broker. A gain or loss in such a sale or exchange transaction is entirely distinct from the source of funds used to finance *434 the transaction. However, the First Circuit in Page v. Rhode Island Hospital Trust Co.,supra, and the Third Circuit in Bramer v. United States,supra, appear to have created an exception to the application of this rule. In Page v. Rhode Island Hospital Trust Co.,supra, the taxpayer was engaging in stock market transactions through a broker using a margin account but without posting the customary 10 percent margin. Substantial losses were incurred on sales of securities over a period of years, with the taxpayer giving the broker notes. The account was finally closed out and the remaining debt paid. The court concluded that the taxpayer had not sustained deductible losses in the years the securities were sold at a loss. Rather, where there was a "'grossly under-margined'" account, the loss from sales of stock "merely represents a debt due a broker from the customer." [6] The First Circuit contrasted this situation with the normal margined account, in which a loss would immediately be charged against the margin and the customer would, therefore, suffer an actual economic loss. The court did not discuss the fact of *435 trading transactions on the New York Exchange, instead treating the transaction as though the taxpayer had simply agreed to purchase the securities from the broker. Apparently, in an "under-margined" account, the court saw the broker, not the taxpayer, as the owner of the stock that was sold at a loss. Only when it actually paid the broker would the taxpayer be entitled to a loss deduction. Because the unsecured notes the taxpayer gave the broker were not cash or its equivalent, they did not entitle it to an earlier deduction. Bramer v. United States,supra, is substantially to the same effect. The taxpayer had incurred a large debt to an independent broker, presumably through speculating on the stock exchange through an under-margined account. Part of the margin in that case was collateralized by securities borrowed from a third party. When the taxpayer's account was closed out by the brokerage firm, the third party redeemed his securities from the broker and the taxpayer gave the third party his note for the amount the third party had paid the broker. The *436 court characterized the initial debt as being between the taxpayer and the broker. When the third party guarantor was substituted as the lender, the debt was not discharged. The taxpayer was still indebted; only the identity of the creditor had changed. Loss was postponed until the note was paid. As in Page v. Rhode Island Hospital Trust Co.,supra, the Third Circuit ignores the fact of trading on an exchange, viewing the transaction as a purchase from the broker. The commodity trades directed by Mr. Hirsch for the 6-1-3 Account in this case, as in both Covington and Vickers, constituted sales or exchanges effected on the Exchange with unrelated parties. They were not sale or exchange transactions entered into with ABC, the broker which acted as the agent for the 6-1-3 Account. We have found that the funds were borrowed from ACC and not from ABC. Whether or not the loans by ACC to Mr. Hirsch would stand up to an arm's-length test is not material. In no event were the loans made by the broker. We have expressly found that the temporary obligation by ABC to supply margin requirements was satisfied by the 6-1-3 Account as the ABC customer on a daily *437 basis. The fact that funds for this purpose were loanded by ACC to the 6-1-3 Account participants brings into play Larkin, not Bramer and RhodeIsland Hospital Trust. Thus, we distinguish Page v. Rhode Island Hospital Trust Co.,supra, as we did in Larkin v. Commissioner,supra.On the same basis, we distinguish Bramer v. United States,supra.
If we were to conclude our analysis at this point, we would simply rest on Larkin. See also Cleveland v. Commissioner,T.C. Memo. 1983-299. The peculiar circumstances of Rhode Island Hospital Trust and Bramer are simply not present here. However, there is a further distinguishing factor which is decisive. Until requested to do so by the Court, neither party had focused on the tax consequences of the joinder by Warehouse, ACASA and Mr. Hirsch in a profit-seeking venture styled 6-1-3 Account, pursuant to the 1972 written agreement. For the reasons set forth herein, we conclude that for Federal tax purposes the joint speculative trading on the Exchange engaged in by these three participants pursuant to the 1972 written agreement constituted *438 a joint venture, taxable as a partnership. The case of Haley v. Commissioner,203 F.2d 815 (5th Cir. 1953), revg. on an issue not discussed 16 T.C. 1509 (1951), is controlling, and on that basis, we find for petitioners. For Federal tax purposes, the term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not a corporation or a trust or estate within the meaning of the Internal Revenue Code of 1954. A joint undertaking merely to share expenses is not a partnership. * * * [Section 301.7701-3(a), Income Tax Regs.; see also section 761(a).] [7]
The 6-1-3 Account was not a corporation, a trust or an estate. As we have found, the 1972 agreement establishing the account provided explicitly for profit or loss to be shared between the three parties in the specified ratios. These three parties joined together for the purpose of attempting to make profits from speculation on the Exchange in *439 cotton futures. Capital, albeit borrowed, was furnished by each of the three parties in the prescribed ratios. Services were provided by Mr. Hirsch. We may speculate that the consideration for the interest-free loan to Mr. Hirsch was the provision of his services to the joint venture. But this question has no bearing on whether the agreement and actions of the parties constituted a tax partnership. Considering all of the facts, as we are directed to do by Culbertson,[8] we find that the parties did in fact intend "to join together in the present conduct of the enterprise." Thus, these parties created a business enterprise for profit with a limited scope. That is the classic illustration of a joint venture. We recognize that the parties disclaimed an intent to engage in a joint venture, but the stated intent of the parties is not conclusive as to the existence of a partnership for Federal tax purposes. Heley v. Commissioner,supra; Fishback v. United States,215 F. Supp. 621 (D.S.D. 1963). [9] We conclude that the 6-1-3 Account constituted a partnership for Federal tax purposes. *440 The fact pattern in this case is quite similar to that in Haley v. Commissioner,supra. As in the present case, in Haley the formal agreements creating the business arrangement giving rise to the loss disclaimed the existence of a joint venture. But the Court of Appeals found that the formal disclaimers were overridden by the fact that the parties had effectively agreed to share profits and losses from the business enterprise. Haley involved an individual taxpayer who joined in a business operation with a corporation. The corporation contributed land and advanced working capital but the individual was required to give the corporation negotiable promissory notes for one-half of the funds advanced. The Court of Appeals treated the taxpayer's incurring the obligation on the promissory notes as being in effect a borrowing of the funds by the taxpayer followed by his contribution of them to the partnership. The fact that the individual taxpayer used funds borrowed from the corporate partner as his share of capital contributed to the partnership was not considered material since his obligation to repay was absolute and unconditional. Here, we have a similar *441 situation. All three partners in the 6-1-3 Account furnished their requisite shares of capital, and petitioner also supplied services, as did the individual taxpayer in Haley. The capital contributed by the partners was obtained by way of loans from ACC, but, as in Haley, it is immaterial that the contributed capital was borrowed. After determining that the taxpayer and a corporation had been operating as a partnership during the years in question, the Fifth Circuit in Haley focused on the proper timing of the individual partner's losses in the following language: By the same token we think a taxpayer on the cash basis, such as petitioner here, is required to take deductions for losses resulting from his interest in a partnership or joint venture in the year they are legally sustained, even though liability for such losses is discharged with borrowed funds. [Citations omitted.] Any other rule might well promote inconsistency in the annual reporting of profits and losses under the tax structure and enable taxpayers to manipulate their financial affairs so as to determine the most profitable year in which to claim losses, in violation of the Supreme Court's admonition *442 that the liability of every taxpayer must be determined on the basis of the economic result to him of each year's experience, and that, "Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation." [Haley v. Commissioner,supra at 819.] Respondent further argues that if the 6-1-3 Account is taxable as a partnership, section 752(b) should apply and under Austin v. United States,461 F.2d 733 (10th Cir. 1972), and Stilwell v. Commissioner,46 T.C. 247 (1966), the losses of Mr. Hirsch were assumed by ACC when the 6-1-3 Account was terminated in 1974. Respondent reaches this result on the assumption that the losses would under the partnership analysis be liabilities of the partnership and that the February 1, 1974, agreement relieved Mr. Hirsch of these liabilities. Again respondent misconstrues the facts and accordingly seeks to apply inapposite case law. In our view of the facts, ACC provided the partners with capital, which they in turn contributed to the joint venture, with Mr. Hirsch thereupon losing the capital *443 in his unsuccessful trading. Even if we were to view the ventures as ACC and Mr. Hirsch, as respondent suggests, the analysis does not change; it merely becomes closer to Haley on the facts. Clearly, ACC did not assume the Hirsch debt; it was the lender from the start. When terminated in 1974, the joint venture did not have any outstanding debt; it simply had no capital. There being no dispute as to the amount of the loss or its characterization as a short-term capital loss, we conclude that petitioners are entitled in 1976 to deduct the short-term capital loss carryover from the years 1973 through 1975, as claimed by them. Since we hold for petitioners on this issue, we do not reach petitioners' estoppel argument. By the same token, we do not reach and therefore do not need to rule on respondent's objections to the admissibility of the evidence contained in the supplemental stipulation of facts as to which we reserved ruling at the trial. Petitioners claim they made a mathematical error on their 1976 return in calculating the gain on the redemption of ACC stock owned by Mrs. Hirsch. This issue wa raised by petitioners' counsel in his opening statement and was fully *444 explained in petitioners' opening brief. Respondent has had ample notice of the issue. While he claims that petitioners have not explained the mechanics of the error, simple subtraction of two figures from the redemption agreement suffices to explain it. We recognize that respondent on audit could have questioned the redemption transaction, including the agreed value of the Mexican properties, but he chose not to do so. It is now too late. When the Rule 155 computations are made, we direct that the gross redemption proceeds be reduced from $1,070,903, the figure reported on the return, to $1,025,443. Decision will be entered under Rule 155.
Footnotes
1. On brief, petitioners' counsel abandoned the issue relating to a claimed capital loss on sale of certain real properties located in Mexico.↩
2. Petitioner Eric D. Hirsch died subsequent to the filing of the petition and Mrs. Hirsch, as Executrix of his estate, was duly substituted as a party.↩
3. ABC has been variously described by Messrs. Baer and Hirsch as a conduit for or alter ego of ACC. It was, however, a separate viable business entity, but subject to direction and control by the management of ACC rather than by its nominal partners, acting independently of ACC.↩
4. Under respondent's analysis, the Hirsch debt was owed to ABC until January 31, 1974, when it was transferred to ACC. The stipulation may be interpreted as supporting this factual conclusion but we have placed decisive weight on the precise testimony of Messrs. Baer and Hirsch to the effect that capital was furnished by ACC to Mr. Hirsch and to Warehouse and to ACASA to be used to fund the 6-1-3 Account trading activities. The February 1, 1974, agreement between ACC and Mr. Hirsch also recites that funds were loaned by ACC to the 6-1-3 Account participants. ABC had no source of funds other than ACC. ABC apparently was not a party to the creation of the 6-1-3 Account, had no interest in its transactions except as the member-broker from which activity it derived little profit and had no business reason to loan funds to its customers. In addition, it had no funds to loan. We conclude that the bookkeeping entries on ABC's books, to the extent they can be construed as reflecting loans by ABC, were simply a convenient form of record without legal significance. It is, in fact, on this record far from clear whether Warehouse and ACASA should be recognized as separate entities or whether ACC was the real party in interest and the actual participant with Mr. Hirsch in the 6-1-3 Account transactions. That issue is not before us and its resolution would not affect the result.↩
5. See also Brenner v. Commissioner,62 T.C. 878↩ (1974), and the cases therein cited.
6. Page. Rhode Island Hospital Trust Co.,88 F.2d 192, 194↩ (1st Cir. 1937).
7. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
8. Commissioner v. Culbertson,337 U.S. 733, 742↩ (1949). 9. See Wheeler v. Commissioner,T.C. Memo. 1978-208↩, for a definitive discussion of joint ventures, including our conclusion that Federal law governs the classification of a joint venture for Federal tax purposes, since it is a partnership sub-class.